*PCS*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS - EASTERN ~~DIVISION~~**

| | | |
|---|---|---|
| **WILLIAM JACKSON, a disabled person,** | ) | 13cv2533 |
| | ) | Judge Bucklo |
| Plaintiff, | ) | Mag. Judge Martin |
| | ) | |
| | ) | **COMPLAINT** |
| | ) | **PLAINTIFF DEMANDS** |
| | ) | **TRIAL BY JURY** |
| v. | ) | |
| | ) | |
| **OWENS CORNING/FIBERBOARD** | ) | **FILED** |
| **ASBESTOS PI TRUST** | ) | |
| | ) | APR X 4 2013 |
| | ) | |
| Defendant. | ) | THOMAS G. BRUTON |
| | ) | CLERK, U.S. DISTRICT COURT |

I.                              <u>**COMPLAINT**</u>

    1.    **Plaintiff WILLIAM JACKSON a disabled person,** of 1441 Wesley Avenue. Berwyn, Illinois. 60402 a citizen of the State of Illinois.

    2.    **Versus the Trustee Citizens of the OWENS CORNING/ FIBREBOARD ASBESTSOS PERSONAL INJURY TRUST A DELAWARE TRUST COMPANY.** *Navarro Saving Association v. Lawrence F. Lee., et al.* 446. 458 U.S. 5 Cir. 597 F. 2d. 421, 64 L. Ed. 425 No. 79-465. (1980). *Thomas v. Board of Trustees,* 195 U.S. 207, 25 S. Ct. 24,49 L. Ed. 160 (1904).

II.                           <u>**DIVERSITY JURISDICTION**</u>

    3.    **Pursuant to, Title 28 U.S.C. Section 1332(a)(1).,** the District Courts have original jurisdiction over all actions of a civil nature where matters in controversy exceeds the sum or value of $75,000 exclusive of interest and cost. A federal court must rest jurisdiction only upon the

1

citizenship of real parties to the controversy and a trustee is a real party to the controversy for purposes of diversity jurisdiction as do here, to this action under civil litigation when the trustees possesses certain customary power to hold, manage, and dispose of assets for the benefit of others. *Navarro Saving Association v. Lawrence F. Lee. Thomas v. Board of Trustee*, 195 U.S. 207, 25 S. Ct. 24, 49 L. Ed. 160 (1904). Whereas plaintiff is a citizen of the state of Illinois, now Diversity of Citizenship exist between ('Trustee Citizen") of the Owens Corning /Fibreboard Asbestos PI Trust. <u>Delaware Trustee,</u> Section 4.11 <u>NOTICE TO TRUSTEE, Section, 7.6(a)(b).</u> Pursuant to Title 28 U.S.C. Section 1332(1), now the court's jurisdiction exist for Plaintiff, and the OWENS CORNING/ FIBREBOARD ASBESTOS PI ('TRUSTEE"). To the PI Trust through the trustee citizens herein below regarding their citizenship being of different states. P. exhibits (A).

(1).   *Harry Huge, Esq:*
       *Huge Law Firm*
       *25 E. Battery Street*
       *Charleston, SC. 29401*
       *Facsimile: (843)720-8794*

(2).   *D. LeAnn Jackson, Esq:*
       *6745 Lakeshore Drive*
       *Dallas, TX. 75214*
       *E-Mail: ljackson @ sbcglobal.net*

(3).   *Hon. Dean M. Trafelet (Ret.); Managing Trustee.*
       *P.O. Box 518*
       *9130 Wild Lane*          *during December-*
       *Bailey Harbor, WI. 54202*   *February:*
       *Facsimile: (920)839-9438*   *50 West Schiller*
       *E-Mail: dtrafelet @ sbcglobal.net*   *Chicago, Il. 60611*

2

**III.**      **COUNT I MERIT OF ASBESTOSIS DISABILITY
UNDER PERSONAL INJURY PRODUCT LIABILITY**

4.      Plaintiff William Jackson a disabled person, re-alleges and incorporates all allegations in paragraph 1 through 27 of this complaint against the OWENS CORNING/FIBERBOARD ASBESTOS PI TRUST, herein after ("Defendant"). P. exhibit (A).

5.      WHEREAS, plaintiff states on merit of debilitating disability asbestosis lung disease injury diagnosed on March 14, 2009 is a continuing medical contributing factor upon the ("Defendant"), is to be recognize in this court documenting a genuine listed lungs impairment medical criteria under the SOCIAL SECURITY ACT, *Title 20 U.S.C. Section. 404.1520(d).* for ASBESTOSIS PERSONAL INJURY <u>WITH PERMANENT DISABILITY</u> a medical criteria which plaintiff claimed under a provided TDP section 5.3(b)(2)i-vi, a civil legal provision for Asbestosis PI damages. P. exhibit (B).

<u>Disability</u>

inability to pursue an occupation
because of physical or mental
impairment.

( i ). Impairment; to damaged.

6.      Contrary to an SEVERE ASBESTOSIS <u>WITH NO DISABILITY</u> a postulation that defendant are asking this court to give it's ruling to.

<u>Severe</u>

inflicting physical discomfort or hardship.

3

( i ). Discomfort; inflammation of a body part.

(ii). Hardship; the state of being deprived.

7.    WHEREAS, plaintiff has provided reasonable proof in this FEDERAL COURT with the proper medical criteria having permanent damaged lungs asbestosis disability. Allowing this court to grant the relief in plaintiff demands for all statutory civil damages on plaintiff medical merits.

8.    WHEREAS, plaintiff states during 1966, he was employed by the UNION CARBIDE CORPORATION, in Chicago, Illinois., as an laborer where he unknowingly was force to breathed large amounts of Owens Corning Kaylo toxic asbestos fibers producing products. P. exhibits ( C ).

9.    WHEREAS, the purpose of the PI Trust, ("Defendant"), is to assume the liabilities of <u>OC, PLUS THEIR PREDECESSORS AND SUCCESSORS IN INTERST, FOR ALL PI TRUST CLAIMS (AS DEFINED IN THE PLAN)</u>. P. exhibit A.

10.   WHEREAS, plaintiff having attained jurisdiction, that IN RE:  OWENS CORNING, et at., Debtors. *Chapter 11, case No.* 00-03837 (JKF)., Jointly Administrated.

SIXTH AMENED JOINT PLAN OF REORGANIZATION FOR OWENS CORNING AND IT'S AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION (AS MODIFIED). P. exhibit (D).

11.   WHEREAS, plaintiff having attained jurisdiction, that pursuant to the defendant, "Trust Distribution Procedures," ("TDP") GOVERNING LAW 8.3 UNDER TDP, Section 5.3(b)(2) i-vi. Under the joint

4

plan bring the statutory affirmed civil remedies for damages for asbestosis disability under personal injury product liability in a federal court, demanding relief herein below on principals of tort. P. exhibit (D).

*the law governing the liquidation of PI asbestos Trust claims in the case of Individual Review. Arbitration or Litigation in the Tort System, shall be the law of the Claimant's jurisdiction as described in section, 5.3(b)(2).*

12.     WHEREAS, STATUTE OF LIMITATION pursuant to, *(735 ILCS 5/13-205).,* provides for a five (5) years period, against disagreement of arbitrators ward. P. exhibits (E).

13.     WHEREAS, proof shows in 1966 defendant manufactured toxic asbestos Kaylo harmful deadly asbestos pipe covering and block heating insulation producing fibrous products when breathed cause personal physical injury. *(735 ILCS 5/2-2101) (i)(ii).* P. exhibits (F).

14.     WHEREAS, proof shows in 1966 defendant as manufacturer did not provided any adequate notice of written warning instructions or labels for any protection of safety to prevent harm cause to plaintiff from a harmful asbestos products. *(735 ILCS 5/2-2106)(a).* P. exhibits ( I ).

15.     WHEREAS, proof shows in 1966 defendant knowingly, let out of their control and placed into the stream of commerce known toxic asbestos kaylo product producing fibers with no adequate warning instructions for any protection of safety to prevent the harm cause to plaintiff from unknowingly breathing toxic deadly asbestos Kaylo fibrous products. *(735ILCS 5/2-2106)(d).* P. exhibit (G).

5

16.    WHEREAS, Proof shows in 1966 defendant knowingly, and clearly understood from a history of knowledge obtained through scientific and medical research results before 1966. Defendant as manufacturer during 1966 had a duty of care to provide adequate warning for the protection against the known harm that would be cause to plaintiff unknowingly from breathing the toxic asbestos Kaylo fibrous products. *(735 ILCS 5/2-2106)(d)*.  P. exhibits (G).

17.    WHEREAS, defendant had obtained the scientific and medical knowledge before 1966 defendant as manufacturer in 1966 continue to allow unknowingly to plaintiff to be in danger being unprotected breathing the harmful and deadly toxic asbestos Kaylo pipe and block heating covering producing fibrous products, defendant provided no adequate warning of the harm. *(735 ILCS 5/2-2106)(d)*.  P. exhibits (G).

18.    WHEREAS, defendant had knowledge before 1966 of the harmful and deadly nature of the toxic asbestos Kaylo fibers if breathed. Defendant as manufacturer failed to make any statements of warning in 1966 to caution unknowing workers not to breathed known toxic asbestos Kaylo fibers for their safety. *(735 ILCS 5/2-2106)(d)*. P. exhibits ( I ).

19.    WHEREAS, defendant being knowledgeable about the harmful nature of the toxic asbestos Kaylo fibrous products if breathed before 1966. defendant as manufacturer still put the Kaylo products while in the defendant control into the stream of commerce along with advertised pictures

6

showing unprotected pipe covering insulation workers, working with and breathing the toxic asbestos Kaylo producing fibers. Covering pipes wearing no respirator mask for protection which pictures had no adequate warning or instructions for safety during 1966. *(735 ILCS 5/2106)(d)*. P. exhibits ( H ).

20.    WHEREAS, defendant were knowledgeable before 1966 about the harmful nature of the toxic asbestos Kaylo fibers if breathed. Plaintiff is now harmed with disability asbestosis from defendant manufacturer placing known toxic asbestos Kaylo producing fibrous products into the stream of commerce during 1966 without any adequate safety warning issued for plaintiff to wear a respirator mask for his protection. *(735 ILCS 5/2-2106)(d)*. P. medical exhibits (B).

21.    WHEREAS, defendant knowing before 1966 about the harmful nature and danger of the toxic asbestos Kaylo fibers if breathed. Defendant as manufacturer still allowed plaintiff and co-workers to work in an known unsafe environment without a respirator as a common laborer unprotected and not knowing of the danger during 1966 when plaintiff was forced to breathed large amounts of toxic asbestos Kaylo pipe and block covering insulation producing fibrous products unknowing to plaintiff without any adequate warning. *(ILCS 5/2-2106)(d)*. P. working history exhibits ( C ).

22.    WHEREAS, defendant were knowledgeable about the harmful deadly nature of the toxic asbestos Kaylo fibers if breathed during 1966. Because as manufacturer defendant had commission and attained the

knowledge and history from the scientific and medical contributed research information done on Kaylo fibers exposure affects on the lungs before 1966. *(735 ILCS 5/2-2106)(d).* P. exhibits (G).

23. WHEREAS, defendant having knowledgeable understanding of known deadly asbestos product before 1966. It wasn't until 1972, because the fear of law suites against Kaylo, defendant as manufacturer then decided that adequate warning should be put on the cartons of the known toxic asbestos Kaylo products to warn unknowing workers for their safety against breathing the toxic asbestos fibers. *(735 ILCS 5/2-2106)(d).* P. exhibits ( I ).

24. WHEREAS, defendant having knowledgeable understanding of a deadly asbestos product before 1966. Still defendant failed as a manufacture to provide to the unknowing workers of the danger, with adequate warning on Kaylo cartons, caution it not safe to breathed toxic asbestos Kaylo pipe covering fibers a product that is known to cause harm, and death, defendant as manufacturer then placed the known toxic asbestos Kaylo producing fibrous products into the stream of commerce during 1966 without any adequate warning. *(735 ILCS 5/2-2106)(d).* P. exhibits ( I ).

25. WHEREAS, defendant as manufacturer with knowledgeable understanding of a deadly known asbestos toxic product before 1966. Still defendant as manufacturer failed to provide adequate warning on cartons of Kaylo in 1966 the time when plaintiff unknowingly was being heavily exposed while cleaning up Kaylo insulation pipe and block covering job sites, using a

8

broom, shovel and air blowing hose, alone with his co-workers who were pipe and block covering insulators removing, and recovering, the pipes, and boilers using toxic asbestos Kaylo insulation products without any warning being put on the Kaylo cartons until 1972, for plaintiff safety. *(735ILCS 5/2-2106)(d)*. P. exhibits ( I ).

26.    For asbestosis damages, Pursuant to, *(735ILCS 5/2-2101)* personal injury product liability, pursuant to, *(735 ILCS 5/2-1115.2) (b)*. Civil penalties relief of non-economic damages are demanded for plaintiff pain, and suffering, disability with asbestosis, disfigurement, loss of consortium, loss of society. P. exhibits (F) page 8-9.

27.    CLOUSTEEN JACKSON, wife of PLAINTIFF WILLIAM JACKSON, a disabled person, are demanding recovery for loss of intimacy and loss of consortium for plaintiff damages. Pursuant to, *(735 ILCS 5/13-202)*.

IV.                           <u>CONCLUSION</u>

WHEREFORE, in the alternative Plaintiff demands relief against Defendant OWENS CORNING/FIBERBOARD ASBESTOS PERSONAL INJURY TRUST ("The Trust"), and pray the Court grant each of the statutory civil penalties demands for all damages herein the above in the aggregate amount of <u>$1,200,000.00</u>

Date: 4-4-2013

Plaintiff William Jackson, a
disabled person, Pro-se
1441 Wesley Avenue
Berwyn, Illinois. 60402
(708) 484-1952

28 USC § 1332 - Diversity of citizenship; amount in controversy; costs | Title 28 - Judiciary and Judicial Pro... Page 1 of

Case: 1:13-cv-02533 Document #: 1 Filed: 04/04/13 Page 11 of 60 PageID #:11



SUPPORT LII



Search all

Follow 8

> Title 28 > Part IV > Chapter 85 > § 1332        ‹ PREV NEXT ›

SEARCH US CODE:

Law about... Articles

Download the PDF (i

Title 28 USC, RSS Feed

Table of Popular Nam

Parallel Table of Author

**USC-prelim**

*USC Prelim* is a preliminary release and may be subject to further revision before it is released again as a final version.

Current through Pub. L. 112-283. (See Public Laws for the current Congress.)

citations cover

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—

  (1) citizens of different States;

  (2) citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State;

  (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

  (4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

(b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff who files the case original... ...urts is finally adjudged to be entitled to recover less than the sum... ), computed without regard to any setoff or counterclaim to whic... ...y be adjudged to

Learn How to Car
Free Consultatio

"5 pages"

PLAINTIFF EXHIBIT A

referred to in the Plan. The Trustees of the PI Trust may transact the business and affairs of the PI Trust in the name of the PI Trust. It is the intention of the parties hereto that the trust created hereby constitute a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 et seq. (the "Act") and that this document, together with the by-laws described herein, constitute the governing instruments of the PI Trust. The Trustees and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto.

*Read this ⟋*

**1.2    Purpose.**  The purpose of the PI Trust is to assume the liabilities of OC and Fibreboard, their predecessors and successors in interest, for all PI Trust Claims (as defined in the Plan), and to use the PI Trust Assets and income to pay the holders of all PI Trust Claims in accordance with this PI Trust Agreement and the TDP in such a way that such holders of PI Trust Claims are treated fairly, equitably and reasonably in light of the limited assets available to satisfy such claims, and to otherwise comply in all respects with the requirements of a trust set forth in Section 524(g)(2)(B) of the Bankruptcy Code.

**1.3    Transfer of Assets.**  Pursuant to the Plan, the PI Trust Share (as defined in the Plan) has been transferred and assigned to the PI Trust to settle and discharge all Asbestos Personal Injury Claims. Pursuant to the Plan, OC, its successors in interest thereto, from and after the Effective Date ("Reorganized OC") and others may also transfer and assign additional assets to the PI Trust from time to time (the "PI Trust Assets"). In all events, the PI Trust Assets will be transferred to the PI Trust free and clear of any liens or other claims by OC, Reorganized OC, any creditor, or other entity. OC, Reorganized OC, and any other transferors shall also

PLAINTIFF
EXHIBIT
A

execute and deliver such documents to the PI Trust as the Trustees reasonably request to transfer and assign the PI Trust Assets to the PI Trust.

### 1.4 Acceptance of Assets and Assumption of Liabilities.

(a) In furtherance of the purposes of the PI Trust, the Trustees, on behalf of the PI Trust, hereby expressly accept the transfer and assignment to the PI Trust of the PI Trust Assets in the time and manner contemplated in the Plan.

(b) In furtherance of the purposes of the PI Trust, the Trustees, on behalf of the PI Trust, expressly assume all liability for all Asbestos Personal Injury Claims. Except as otherwise provided in this PI Trust Agreement and the TDP, the PI Trust shall have all defenses, cross-claims, offsets, and recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights, regarding such claims that OC and Reorganized OC have or would have had under applicable law. Regardless of the foregoing, however, a claimant must meet otherwise applicable federal, state and foreign statutes of limitations and repose, except as otherwise provided in Section 5.1(a)(2) of the TDP.

(c) No provision herein or in the TDP shall be construed to mandate distributions on any claims or other actions that would contravene the PI Trust's compliance with the requirements of a qualified settlement fund within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the IRC.

(d) OC, Reorganized OC, Fibreboard and Reorganized Fibreboard, and any successor in interest of each of the foregoing, shall be entitled to indemnification from the PI Trust for any expenses, costs, and fees (including reasonable attorneys' fees and costs, but excluding any such expenses, costs, and fees incurred prior to the Effective Date), judgments,

- 5 -



PLAINTIFF
EXHIBIT
A

settlements, or other liabilities arising from or incurred in connection with any action related to OC and Fibreboard Asbestos Personal Injury Claims, including, but not limited to, indemnification or contribution for such claims prosecuted against Reorganized OC or Reorganized Fibreboard.

(e)     Nothing in this PI Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Section 524(g) injunction issued in connection with the Plan or the PI Trust's assumption of all liability for PI Trust Claims, subject to the provisions of Section 1.4(b) above.

## SECTION 2

## POWERS AND TRUST ADMINISTRATION

### 2.1     Powers.

(a)     The Trustees are and shall act as the fiduciaries to the PI Trust in accordance with the provisions of this PI Trust Agreement and the Plan. The Trustees shall, at all times, administer the PI Trust and the PI Trust Assets in accordance with the purposes set forth in Section 1.2 above. Subject to the limitations set forth in this PI Trust Agreement, the Trustees shall have the power to take any and all actions that, in the judgment of the Trustees, are necessary or proper to fulfill the purposes of the PI Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto, and any trust power now or hereafter permitted under the laws of the State of Delaware.

- 6 -

PLAINTIFF
EXHIBIT
A

WHEREAS, it is the intent of OC, the Trustees, the Committee, the TAC, and the Future Claimants' Representative that the PI Trust be administered, maintained, and operated at all times through mechanisms that provide reasonable assurance that the PI Trust will satisfy all PI Trust Claims pursuant to the Owens Corning/Fibreboard Asbestos Personal Injury Trust Distribution Procedures ("TDP") that are attached to the Disclosure Statement as Exhibit D-1 in a substantially similar manner, and in strict compliance with the terms of this PI Trust Agreement; and

WHEREAS, all rights of the holders of PI Trust Claims arising under this PI Trust Agreement and the TDP shall vest upon the Effective Date; and

WHEREAS, pursuant to the Plan, the PI Trust is intended to qualify as a "qualified settlement fund" within the meaning of Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code ("IRC"); and

WHEREAS, the Bankruptcy Court has determined that the PI Trust and the Plan satisfy all the prerequisites for an injunction pursuant to Section 524(g) of the Bankruptcy Code, and such injunction has been entered in connection with the Confirmation Order;

NOW, THEREFORE, it is hereby agreed as follows:

PLAINTIFF
EXHIBIT
A

## SECTION 1

## AGREEMENT OF TRUST

1.1 **Creation and Name.** OC as Settlor hereby creates a trust known as the Owens Corning/Fibreboard Asbestos Personal Injury Trust or PI Trust, which is provided for and

Exhibit A

SEP-14-2009  14:38          NORTH RIVERSIDE 502                                    P.002

SPIROMETRY  REPORT        Cooperation/Effort/Comprehension          TEST DATE: 03/14/09
PB100  SW Rev:  J-J                                                 TIME:      11:38 AM

Patient Name: William Jackson
Patient ID: 354385267        Age:        Height (in):  66    Weight (lbs):  148        : Male   Race Correction:  No
Barometric Pressure (mmHg):  760    Temp (deg F): 70    BTPS Correction:  1.110        Sensor: FS200   Insp Code:      None

Period Time:  11:41 AM

| FVC TEST DATA - Clinical Format | | | BEST TEST SUMMARY | | Knudson 83 Adult Predicted Normals | |
| Measurement | | PreMed | Pred | %Pred | PostMed | %Pred | %Change |
| FVC | (L) | 1.29 | 3.49 | 37% | | | |
| FEV1 | (L) | 1.29 | 2.79 | 46% | | | |
| %FEV1 | (%) | 100.00 | 80.78 | 124% | | | |
| FEF25%-75% | (L/S) | 4.54 | 2.90 | 157% | | | |
| PEF | (L/S) | 6.62 | 7.56 | 88% | | | |
| FEV3 | (L) | 1.29 | 3.36 | 38% | | | |
| FET | (S) | 0.97 | | | | | |

Variability: PreMed: FVC = 41.1%(530ml) FEV1 = 42.6%(550ml) PEF = 24.8%

Interpretations:

PREMED:   Testing indicates severe restriction.
Comments:

"Note" at the height of 66"

FVC L. according to the listing
is 1.55. Claimant FVC L. are at 1.29

"listed
"Medical record" (20 C.F.R. 404.1520(d)
disability SSA

"8 pages"

PLAINTIFF
EXHIBIT
B

C00003.

SEP-14-2009  14:38     NORTH RIVERSIDE 502

P.003

SPIROMETRY REPORT     Cooperation/Effort/Comprehension     TEST DATE: 03/14/09
PB100 SW Rev:  J-J                                          TIME:      11:38 AM

Patient Name: William Jackson
Patient ID: 354385267      Age: 63   Height (in): 66   Weight (lbs): 148   Print Time: 11:41 AM   Sex: Male   Race Correction: No
Barometric Pressure (mmHg): 760   Temp (deg F): 70   BTPS Correction: 1.110   Sensor: FS200   Insp Code:      None



"Note" after the second trial. with a moment of rest Claimant third trial, shows only a small improvase

listed Medical record
SSA disability
for SSI

PLAINTIFF
EXHIBIT
B

TOTAL P.003



an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

### 3.01 Category of Impairments, Respiratory System

### 3.02 Chronic pulmonary insufficiency

A. Chronic obstructive pulmonary disease due to any cause, with the $FEV_1$ equal to or less than the values specified in table I corresponding to the person's height without shoes. (In cases of marked spinal deformity, see 3.00E.);

**Table I**

| Height without Shoes (centimeters) | Height without Sh... | $FEV_1$ Equal to or less |
|---|---|---|
| 176-180 | 70-71 | 1.55 |
| 181 or more | 72 or more | 1.65 |

or

B. Chronic restrictive ventilatory disease, due to any cause, with the FVC equal to or less than the values specified in Table II corresponding to the person's height without shoes. (In cases of marked spinal deformity, see 3.00E.);

**Table II**

| Height without Shoes (centimeters) | Height without Shoes (inches) | FVC Equal to or less than (L,BTPS) |
|---|---|---|
| 154 or less | 60 or less | 1.25 |
| 155-160 | 61-63 | 1.35 |
| 161-165 | 64-65 | 1.45 |
| 166-170 | 66-87 | 1.55 |
| 171-175 | 68-69 | 1.65 |
| 176-180 | 70-71 | 1.75 |
| 181 or more | 72 or more | 1.85 |

*[Handwritten annotations:]*

"listed Medical" Record SSA Disability for SSI

"Note"

Claimant FVC Values, according to the Museuskeletal examination, stating Claimant hop on one leg, and then Squat "totaly Unture" Claimant was Unabled to do both of the Mistated examinations, at being examination.

**PLAINTIFF EXHIBIT B**

C 00035

~Respiratory-Adult

~Page 1 o.



# Disability Programs

## Medical/Professional Relations

### Disability Evaluation Under Social Security
(Blue Book- September 2008)

## 3.00 Respiratory System - Adult

Search Blue Book

ult Listings (Part A)

ildhood Listings (Part B)

neral Information

dentiary Requirements

ting of Impairments
erview)

**Section**

3.01
Category of
Impairments,
Respiratory System

3.02
Chronic pulmonary
insufficiency

3.03
Asthma

3.04
Cystic Fibrosis

3.06
Pneumoconiosis

3.07
Bronchiectasis

3.08
Mycobacterial,
mycotic, and other
chronic persistent
infections of the lung

3.09
cor pulmonale
secondary to chronic
pulmonary vascular
hypertension

3.10
Sleep-related
breathing disorders

3.11

**3.00 Respiratory System**

A. Introduction. The listings in this section describe impairments resulting from respiratory disorders based on symptoms, physical signs, laboratory test abnormalities, and response to a regimen of treatment prescribed by a treating source. Respiratory disorders along with any associated impairment(s) must be established by medical evidence. Evidence must be provided in sufficient detail to permit an independent reviewer to evaluate the severity of the impairment.

Many individuals, especially those who have listing-level impairments, will have received the benefit of medically prescribed treatment. Whenever there is evidence of such treatment, the longitudinal clinical record must include a description of the treatment prescribed by the treating source and response in addition to information about the nature and severity of the impairment.

Back to Top

It is important to document any prescribed treatment and response, because this medical management may have improved the individual's functional status. The longitudinal record should provide information regarding functional recovery, if any.

Some individuals will not have received ongoing treatment or have an ongoing relationship with the medical community, despite the existence of a severe impairment(s). An individual who does not receive treatment may or may not be able to show the existence of an impairment that meets the criteria of these listings.

Even if an individual does not show that his or her impairment meets the criteria of these listings, the individual may have an impairment (s) equivalent in severity to one of the listed impairments or be disabled because of a limited residual functional capacity.

Unless the claim can be decided favorably on the basis of the cu... ... itudinal record is still important because it w ... bout such things as the ongoing medical s... ... the level of the individual's functioning, a... ... , and duration of symptoms. Also, the si... ... ncludes a requirement for continuing ... te a regimen of prescribed treatment.

"listed Medical record SSA disability for SSI"

PLAINTIFF
EXHIBIT
B

Case: 1:13-cv-02533 Document #: 1 Filed: 04/04/13 Page 20 of 60 PageID #:20

07/20/2009  13:05    17732377923              OFFICE DEPOT 503                    PAGE 15/24

# Social Security Administration
# Supplemental Security Income
Notice of Award

7222 W CERMAK ROAD
ROOM 600
NORTH RIVERSIDE IL 60546

Date:  April 13, 2009
Claim Number:  XXX-XX-5267 DI

000076528 03 MB  0.619   0406,M06,018
502 09S1632A51688

WILLIAM J JACKSON
1441 WESLEY AVE
2ND FLOOR
BERWYN IL 60402-1220

* Application Filed *
December 31, 2008

* Type of Payment *
Individual—Disabled

This is to notify you that you are eligible to receive Supplemental Security Income (SSI) payments under the provisions of Title XVI of the Social Security Act. The rest of this letter will tell you more about our decision.

## How Much We'll Pay

| *Beginning* | *Through* | *Monthly Amount Payable* |
|---|---|---|
| December 31, 2008 | December 31, 2008 | $0.00 |
| January 1, 2009 | Continuing | $674.00 |

## Information About Your SSI Payments

- We are sending you a check for $2,022.00. This is money due you for January 2009 through March 2009. We will also be sending you a check for $674.00 on May 1, 2009. This is the amount due you for May 2009.

- You should receive the check no later than April 16, 2009. Your regular monthly check of $674.00 will then be issued about the first day of the month.

- Since we paid $674.00 for April 2009 through May 2009, $2,022.00 is the rest of the payment due you for January 2009 through March 2009.

SSA-L8025

PLAINTIFF
EXHIBIT
B

listed Medical
Record
SSA
disability for SSI

(TUE)MAR 24 2009 10:08/ST. 8:50/No. 6820450458 P 50

William Jackson 
XXX-XX-5267

March 14, 2009
Page 3

limits throughout. There was no evidence of cervical or lumbar nerve root compression or peripheral neuropathy. Cerebellar testing was negative. Cranial nerves were intact. Claimant was able to produce sustained, audible and understandable speech.

**MENTAL STATUS EXAMINATION:** General observations are as noted above. The claimant was able to relate clear, concise, coherent medical history without apparent cognitive difficulties. Affect was normal without signs of depressive disorder. Hygiene and grooming were good.

Please note: Claimant did at times exhibit rudeness to the staff and refused to be rescheduled for pulmonary function testing that was additionally requested.

From observation it is apparent the claimant is capable of responsibly managing funds in his own interest.

*(Note to CE report reviewer: In any case where there is a finding of an acute medical problem, our policy is to instruct the claimant to follow up immediately with the primary care physician. For example, this applies most commonly to cases where the blood pressure is significantly elevated at the time of the examination. If there is no current PCP, a list of community care centers (including free county facilities) is provided to the claimant. For example, if elevated blood pressure was found, the claimant is sent home with a form documenting their current blood pressure with instructions to share with the treating source. Finally, educational materials from the American Heart Association are provided in the event of elevated blood pressure.)*

**CLINICAL IMPRESSION:**

Problem #1: Asbestosis – the claimant has some history of asbestosis with abnormal lung examination and crackles on examination.

Problem #2: Diabetes – no evidence of end organ disease.

Problem #3: Hypertension – the claimant has severely elevated blood pressure but this seems to be his baseline. No evidence of end organ disease on examination.

At the end of the examination the claimant was asked if all medical complaints were addressed today and claimant responded affirmatively.

Thank you for referring this claimant. If you have any questions, please feel free to contact me.

Jeffrey J. Ryan, MD
Illinois State License #036-101440
Expiration Date 07/31/11

JR/lsk
DD:3/14/09
DT:3/17/09

listed Medical
record SSA
disability for SSI

**PLAINTIFF**
**EXHIBIT**
**B**

C00041

FROM.                              (TUE)MAR 24 2009 10:05/ST. 8:50/No. 882C450458 P 18

## Chicago Consulting Physicians

Jeffrey J. Ryan, M.D.
104 S. Michigan Avenue - Suite 910
Chicago, Illinois 60603
(312)855-1414

### Internal Medicine Consultative Examination
### for the
### Bureau of Disability Determination Services

| | | | |
|---|---|---|---|
| Claimant: | **William Jackson** | Adjudicator: | **D. Sexson** |
| SS#: | **XXX-XX-5267** | Code#: | **E:12-199** |
| Exam Date: | **March 14, 2009** | | |

**GENERAL INFORMATION:** I reviewed all information sent by the Bureau of Disability Determination Services, which included the allegation form, emphasis items as well as form SSA-3368.

I spent 35 minutes with the claimant, reviewing medical records and forms, and formulating and dictating this evaluation report. The claimant was informed about the purpose of this examination and my role as a consultative examiner. The claimant understood that this information will be sent confidentially to the Bureau of Disability Determination Services and is to be used solely for the purpose of evaluating this applicant's claim for disability benefits. I also explained to the claimant, and the claimant understood, that this interview and exam does not constitute a doctor/patient relationship, and specifically that it in no way constitutes a treating relationship. The claimant responded and understood that this information is to be used strictly for the purpose of supplying information relevant to the listings criteria of the Social Security Disability program. The claimant is a 63 year old male.

**CHIEF COMPLAINT(S):** "Asbestosis."

**HISTORY OF PRESENT COMPLAINTS:** The claimant states that he was first diagnosed with asbestosis in approximately 1995. At that time he was getting progressively worsening shortness of breath and states it has been getting progressively worse since then. The claimant states that currently he is generally short of breath at rest and gets very fatigue and short of breath with any activity whatsoever. He states that he can walk approximately 50 feet before having to stop due to fatigue and shortness of breath. The claimant states that he has been on lung medication without any significant benefit and thus no longer takes them.

The claimant has a history of _____ the 1990s. He is unaware of any complications.

The claimant states that he has b_____

blood pressure 3 years ago and states

listed Medical
record SSA
disability for SSA

PLAINTIFF
EXHIBIT
B

William Jackson
XXX-XX-5287

March 14, 2009
Page 2

it is always poorly controlled. He does not respond well to his medications and has had no complications associated with his hypertension.

**PAST MEDICAL HISTORY: Medications:** Advil, Lisinopril. **Allergies:** None known. **Past Medical Problems:** Negative except as above. **Past Hospitalization/Surgical History:** The claimant had some surgery on his right knee. **Tobacco Use:** The claimant has a history of tobacco use for a short time, quitting in 1971. **Alcohol Use:** Denies presently. **Illicit Drug Use:** Denies presently. **REVIEW OF SYSTEMS:** Otherwise negative.

**EMPLOYMENT HISTORY:** The claimant last worked in 1982 at American Decal.

**PHYSICAL EXAMINATION: Vitals:** Reveals a height without shoes of 65-3/4 inches and a weight of 148.2 lbs. Blood pressure is 198/110 with an appropriate size cuff. Pulse is 88 per minute and regular. Respiratory rate is 18 and unlabored. **General appearance –** in the room the claimant was sitting in a chair, propped up by a pillow, and seemed to be in some discomfort. He was not able to speak in long sentences without having to stop for breath.

**SKIN:** No evidence of rash or neoplasia.

**HEENT: Head:** Normal cephalic and atraumatic. **Eyes:** Pupils equal and reactive to light. Fundi were benign. Extraocular eye movements were intact. Visual fields were intact. Sclerae were nonicteric and non-injected. **Ears:** TM's were intact. **Nose:** Nares patent. **Throat:** Not injected.

**NECK:** Supple, without lymphadenopathy, goiter, JVD or bruit.

**LUNGS:** The claimant did have some basal crackles.

**CARDIAC:** Normal S1 and S2, without murmurs or gallops.

**ABDOMEN:** Soft, non-tender, with normoactive bowel sounds. Liver and spleen were not enlarged. There were no abdominal masses. No abdominal bruits appreciated.

**VASCULAR: Arterial:** Pulses are full and symmetric throughout with intact dorsalis pedis and posterior tibial pulses bilaterally. **Venous:** No trophic changes, varicosities, edema or ulcerations.

**MUSCULOSKELETAL:** Examination reveals a full painless range of motion in degrees of all joints. There was no swelling, thickening or deformity of any joints. Gait and ability to bear weight were normal without the use of an assisting device. Claimant was able to hop on one leg, squat and perform both tandem and heel/toe walk. The claimant had normal grip strength bilaterally. Ability to grasp, finger and manipulate with each hand was entirely normal. Please refer to the musculoskeletal system review and range of motion form for further details.

*[handwritten: Claimant as of asked to do any ?]*
*[handwritten: This is not true. "I was not able to hop on one leg or squat]*

**BACK:** Non-tender with full range of ... al muscle spasms.

**NEUROLOGIC:** Strength, sensation ... s were symmetric and within normal

*[handwritten: listed Medical record SSA disability for SSI]*

PLAINTIFF EXHIBIT B

| HOURS | | EARNINGS | | | | WITH. TAX | FICA TAX | STATE TAX | BONDS | SAVINGS PLAN | MISC. | | NET PAY |
| OVERTIME | REGULAR | REGULAR | OVERTIME | OTHER | TOTAL | | | | | | AMOUNT | CODE | |
| | | | | | | | | | | | | CODE | |
| 6.00 | 40.00 | 124.80 | 28.08 | 4.60 | 157.48 | 1.50 | 8.10 | 2.49 | | 9.00 | | | 122.30 |

**UNION CARBIDE CORPORATION** FIBERS AND FABRICS DIVISION. **FIBER BOND PRODUCTS**
3250 S. KEDZIE AVENUE
CHICAGO, ILLINOIS 60623

## NOT NEGOTIABLE

## STATEMENT OF EARNINGS AND DEDUCTIONS

OYEE: RETAIN THIS STATEMENT. IT IS A RECORD OF YOUR EARNINGS AND TAX DEDUCTIONS
AS REPORTED TO THE FEDERAL AND STATE GOVERNMENTS.

**MISCELLANEOUS CODE**
1—UNION DUES
2—MAJOR MEDICAL
3—GROUP MEDICAL
4—GROUP INSURANCE
4—SAFETY SHOES
5—
6—

Job Sits "6 Phases"
Exposure to Kanyestestos

PLAINTIFF
EXHIBIT
C

ILLIANA BUSINI

30

07/20/2009  13:15  17732377923          OFFICE DEPOT 503          PAGE  02/20

SSA-1826
VERSION 1984.002 * * *     ITEMIZED STATEMENT OF EARNINGS
                           FOR SSN 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

FROM: SOCIAL SECURITY ADMINISTRATION
      OFFICE OF CENTRAL RECORDS OPERATIONS
      BALTIMORE, MARYLAND 21235-0000

MR. WILLIAM JACKSON

4713 W LEMOYNE

NUMBER HOLDER NAME:
WILLIAM J JACKSON

                                                                JOB:  * * *

EMPLOYER NUMBER: 13-1421730
UNION CARBIDE CORPORATION
39 OLD RIDGEBURY RD GI 322
DANBURY     CT 06817 0001

1966                                        847.09          91.20 $    2,164.19

EMPLOYER NUMBER:  36-1335430
RALOK CORP
192 MORAINE RD
HIGHLAND PARK    IL 60035 1932

1986                                      1,225.90                     320.23

EMPLOYER NUMBER:  36-0836100
E W BREDEMEIER CO
4029 W WRIGHTWOOD
CHICAGO          IL 60639 2124

1967                         299.00         733.93          320.23 $

"Job Sits"
Exposure to Kaylo Asbestos

PLAINTIFF
EXHIBIT
C

### SUPPLEMENTAL PAGE
### FOR SSN 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

## IDENTIFICATION DATA

354385287    JACKSO  11-45 MALE   WJ              DS   CL   SP -

### YEARLY EARNINGS

| YEAR | AMOUNT | PATN | S | A | FICA | YEAR | AMOUNT | PATN | S | A | FICA |
|------|--------|------|---|---|------|------|--------|------|---|---|------|
| 1951 |        |      | 0 | - | 03600 | 1952 |        |      | 0 | - | 03600 |
| 1953 |        | NNNN | 0 | - | 03800 | 1954 |        | NNNN | 0 | - | 03800 |
| 1955 |        | NNNN | 0 | 0 | 04200 | 1956 |        | NNNN | 0 | 0 | 04200 |
| 1957 |        | NNNN | 0 | 0 | 04200 | 1958 |        | NNNN | 0 | 0 | 04200 |
| 1959 |        | NNNN | 0 | 0 | 04800 | 1960 |        | NNNN | 0 | 0 | 04800 |
| 1961 |        | NNNN | 0 | 0 | 04800 | 1962 |        | NNNN | 0 | 0 | 04800 |
| 1963 |        | NNNN | 0 | 0 | 04800 | 1964✗ | ✗1,431.83 | NCCC | 0 | 0 | 04800 |
| 1965✗ | ✗1,230.67 | CCCC | 0 | 0 | 04800 | 1966✗ | ✗3,039.12 | CCCC | 0 | 0 | 06600 |
| 1967✗ | ✗2,151.59 | CCCC | 0 | 0 | 06600 | 1968✗ | ✗ 203.00 | CNNN | 0 | 0 | 07800 |
| 1969 |        | NNNN | 0 | 0 | 07800 | 1970 | 104.15 | NNCN | 0 | 0 | 07800 |
| 1971 |        | NNNN | 0 | 0 | 07800 | 1972 |        | NNNN | 0 | 0 | 09000 |
| 1973 15 |      | NNNN | 0 | 0 | 10800 | 1974 |        | NNNN | 0 | 0 | 13200 |
| 1975 |        | NNNN | 0 | 0 | 14100 | 1976 |        | NNNN | 0 | 0 | 15300 |
| 1977 | 290.13 | CNNN | 0 | 0 | 16500 | 1978 |        | NNNN | N | N | 17700 |
| 1979✗ | ✗3,778.00 | CCCC | N | N | 22900 | 1980✗ | ✗8,200.94 | CCCC | N | N | 25900 |
| 1981✗ | ✗4,148.61 | CCCC | N | N | 29700 | 1982 |        | NNNN | N | N | 32400 |
| 1983 |        | NNNN | N | N | 35700 | 1984 |        | NNNN | N | N | 37800 |
| 1985 |        | NNNN | N | N | 39600 | 1986 |        | NNNN | N | N | 42000 |
| 1987 |        | NNNN | N | N | 43800 | 1988 |        | NNNN | N | N | 45000 |
| 1989 |        | NNNN | N | N | 48000 | 1990 |        | NNNN | N | N | 51300 |
| 1991 |        | NNNN | N | N | 53400 | 1992 |        | NNNN | N | N | 55500 |
| 1993 |        | NNNN | N | N | 57600 | 1994 |        | NNNN | N | N | 60600 |
| 1995 |        | NNNN | N | N | 61200 | 1996 |        | NNNN | N | N | 62700 |

*Job sits*
*Exposure to kaylo asbestos*

PLAINTIFF

EXHIBIT

C

Unsaved Spreadsheet

## Owens Corning Site List as of December 30, 2009

SITE_CODE SITE_NAME
    10018958 ANCO INSULATION CO.
    10018977 BROWN & ROOT INC.
    10018978 BRUCE ROBINSON ELECTRIC LTD.
    10018991 CANADIAN CHEMICAL CO.
    10019059 FIBERGLAS CANADA LIMITED
    10019108 GUNNAR MINES LTD. - WATERWAYS
    10019141 M/F FEDERAL ELECTRIC CORP
    10019225 PREMIER INDUSTRIAL LTD.
    10019357 BROWN & ROOT LIMITED
    10019358 BRUCE ROBINSON ELECTRIC LIMITED
    10019362 CANADIAN CHEMICAL COMPANY
    10019365 FLUOR CORPORATION
    10019367 GUNNAR MINES LIMITED
    10019373 NORTHERN TRANSPORTATION COMPANY LIMITED
    10019374 OWENS CORNING CANADA INCORPORATED
    10019379 PREMIER INDUSTRIAL LIMITED
    10000209 ALASKA STEAM COMPRESSOR PLANT
    10000402 ANCHORAGE TERMINAL - PHASE I
    10000612 BALLASTING AREA
    10000813 BELUGA POWER - UNIT #3
    10000814 BELUGA POWER - UNITS #1 & #2
    10000864 BERNICE LAKE GAS TURBINE
    10001004 BP OIL - NORTH SLOPE FACILITY
    10001243 CAMPBELL CREEK PUMP STATION
    10001420 CHESTER CREEK PUMP STATION
    10001428 CHEVRON ASPHALT COMPANY
    10001612 COLLIER CARBON & CHEMICAL
    10002091 DOCK - FIRE LANE
    10002333 ELMENDORF AIR FORCE BASE
    10002709 FORT RICHARDSON
    10002710 FORT RICHARDSON - STEAM DISTRIBUTION SYSTEM FY-73
    10002735 FORT WAINNRIGHT
    10002736 FORT WAINNRIGHT - MANHOLES
    10002882 GENERAL ELECTRIC - TURBINE
    10003638 INDUSTRIAL AIR PRODUCTS
    10003639 INDUSTRIAL AIR PRODUCTS - LOX FACILITY
    10003644 INDUSTSRIAL REFRIGERATION & ASSOCIATION - STEAM & CONDENSATE LINES
    10004199 LADD AIR FORCE BASE
    10004365 LIQUID AIR INCORPORATED
    10004703 MATAMISKA MAID
    10006145 PROCESS PIPING
    10006182 PROCUR PIPING
    10006533 RYAN & HAWORTH - STEAM & CONDENSATION LINES
    10007099 SHELL OIL
    10007127 SHELL OIL - ON SHORE FACILITY
    10007130 SHELL OIL - PLATFORM A
    10007636 STANDARD OIL
    10007642 STANDARD OIL
    10007646 STANDARD OIL
    10007652 STANDARD OIL
    10007657 STANDARD OIL - ASPHALT FACILITIES
    10007658 STANDARD OIL - ASPHALT PLANT
    10007659 STANDARD OIL - BOX
    10007663 STANDARD OIL - SEX 53
    10007664 STANDARD OIL - SEX 82

*Job Sits Exposure to kaylo asbestos* (handwritten)

PLAINTIFF
EXHIBIT
C

**Unsaved Spreadsheet**

10018011 UNION CARBIDE CO

"Job Sits" exposure to kaylo asbestos

PLAINTIFF
EXHIBIT
C

Unsaved Spreadsheet

CHICAGO                    IL

Job Sits in Chicago, Exposure to Kay asbestos

PLAINTIFF
EXHIBIT
C

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) |
| | ) Chapter 11 |
| OWENS CORNING, et al., | ) |
| | ) Case No. 00-03837 (JKF) |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) |

## SIXTH AMENDED JOINT PLAN OF REORGANIZATION FOR OWENS CORNING AND ITS AFFILIATED DEBTORS AND DEBTORS-IN-POSSESSION (AS MODIFIED)

SAUL EWING LLP
Norman L. Pernick (I.D. # 2290)
J. Kate Stickles (I.D. # 2917)
222 Delaware Avenue
P.O. Box 1266
Wilmington, DE 19899-1266
(302) 421-6800

Charles O. Monk, II
Jay A. Shulman
Lockwood Place
500 E. Pratt Street
Baltimore, MD 21202
(410) 332-8600

Adam H. Isenberg
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
(215) 972-7777

Attorneys for the Debtors and
Debtors-in-Possession

SIDLEY AUSTIN LLP
James F. Conlan
Larry J. Nyhan
Jeffrey C. Steen
Dennis M. Twomey
Andrew F. O'Neill
1 South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Attorneys for the Debtors and
Debtors-in-Possession

COVINGTON & BURLING
Mitchell F. Dolin
Anna P. Engh
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
(202) 662-6000

Special Insurance Counsel to Debtors
and Debtors-in-Possession (as to insurance
matters)

PLAINTIFF
EXHIBIT
D

be determined to be inconsistent with or contrary to OC's or Fibreboard's obligations to any insurance company providing insurance coverage to OC and/or Fibreboard in respect of claims for personal injury based on exposure to asbestos-containing products manufactured or produced by OC or Fibreboard, the PI Trust with the consent of the TAC and the Future Claimants' Representative may amend this TDP and/or the PI Trust Agreement to make the provision of either or both documents consistent with the duties and obligations of OC or Fibreboard to said insurance company.

**8.3    Governing Law.**  Except for purposes of determining the liquidated value of any PI Trust Claim, administration of this TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware.  The law governing the liquidation of PI Trust Claims in the case of Individual Review, arbitration or litigation in the tort system shall be the law of the Claimant's Jurisdiction as described in Section 5.3(b)(2) above.

statutory demands
for Judicial relief
by the law of Civil
affirmation

"3 pages"

PLAINTIFF
EXHIBIT
D

*(Note)" The Medical/and Exposure Criteria ⟶ Under Individual Review. are not Seperated, the or the amount of the Claim also.*

**5.3(b)(1)(B) Review of Liquidated Value.** Claimants holding claims involving Disease Levels II – VIII shall also be eligible to seek Individual Review of the liquidated value of their OC and Fibreboard Claims, as well as of their medical/exposure evidence. The Individual Review Process is intended to result in payments from the OC and/or Fibreboard Sub-Accounts equal to the full liquidated value for each claim multiplied by the Payment Percentage; however, the liquidated value of any OC or Fibreboard Claim that undergoes Individual Review may be determined to be less than the Scheduled Value the claimant would have received under Expedited Review. Moreover, the liquidated value for a claim involving Disease Levels II – VIII shall not exceed the Maximum Value for the relevant Disease Level set forth in Section 5.3(b)(4) below, unless the claim meets the requirements of an Extraordinary Claim described in Section 5.4(a) below, in which case its liquidated value cannot exceed the Maximum Value set forth in that provision for such claims. Because the detailed examination and valuation process pursuant to Individual Review requires substantial time and effort, claimants electing to undergo the Individual Review Process may be paid the liquidated value of their PI Trust Claims later than would have been the case had the claimant elected the Expedited Review Process. Subject to the provisions of Section 5.8, the PI Trust shall devote reasonable resources to the review of all claims to ensure that there is a reasonable balance maintained in reviewing all classes of claims.

PLAINTIFF
EXHIBIT
D

*"Note" Read this ↗*

**5.3(b)(2)   Valuation Factors to be Considered in Individual Revie**

*The amount of money*

The PI Trust shall liquidate the value of each OC and Fibreboard Claim that undergoes Individual Review based on the historic liquidated values of other similarly situated claims in the tort system for the same Disease Level. The PI Trust will thus take into consideration all of the factors that affect the severity of damages and values within the tort system including, but not

*Note)" all of this is consider*

limited to credible evidence of (i) the degree to which the characteristics of a claim differ from the presumptive Medical/Exposure Criteria for the Disease Level in question; (ii) factors such as the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependencies, special damages, and pain and suffering; (iii) whether the claimant's damages were (or were not) caused by asbestos exposure to an asbestos-containing product prior to December 31, 1982 for which OC or Fibreboard has legal responsibility (for example, alternative causes, and the strength of documentation of injuries); (iv) the industry of exposure; *medical / exposure* (v) settlements and verdict histories in the Claimant's Jurisdiction for similarly situated claims; and (vi) settlement and verdict histories for the claimant's law firm for similarly situated claims.

For these purposes, the "Claimant's Jurisdiction" is the jurisdiction in which the claim *first* was filed (if at all) against OC or Fibreboard in the tort system prior to the Petition Date. If the claim was not filed against OC or Fibreboard in the tort system prior to the Petition Date, the claimant may elect as the Claimant's Jurisdiction either (i) the jurisdiction in which the claimant resides at the time of diagnosis or when the claim is filed with the PI Trust; or (ii) a jurisdiction in which the claimant experienced exposure to an asbestos-containing product for which OC or Fibreboard has legal responsibility.

With respect to the "Claimant's Jurisdiction" in the event a personal representative or authorized agent makes a claim under this TDP for wrongful death with respect to which the governing law of the Claimant's Jurisdiction could only be the Alabama Wrongful Death Statute, the Claimant's Jurisdiction for such claim shall be the Commonwealth of Pennsylvania, and such claimant's damages shall be determined pursuant to the statutory and common laws o Commonwealth of Pennsylvania without regard to its choice of law principles. The law provision in Section 7.4 below applicable to any claim with respect to wh

**PLAINTIFF EXHIBIT D**

07/09/2010  13:01     312-464-1429           GOLDBERG, WEISMAN&CAI            PAGE  02/02

## AMERICAN ARBITRATION ASSOCIATION

In the Matter of the Arbitration between

Re: 31 207 00150 10
    William Jackson
    and
    Owens Corning Asbestos Settlement Trust

*Proof of Award*

*"3 Pages"*

### AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the Owens Corning Asbestos Personal Injury Alternative Dispute Resolution Procedures entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby, AWARD, as follows:

$0   (Zero)

This Award is in full settlement of all claims submitted to this Arbitration.

I, Hon. John E. Morrissey, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

July 9, 2010
—————————————
Date

—————————————  Hon. John E. Morrissey

*Plaintiff non-binding Arbitrator award*

PLAINTIFF
EXHIBIT
E

RECEIVED TIME  JUL. 9.  1:56PM

C00136

the person who inflicted such injury has completed his
sentence therefor.
(Source: P.A. 84-1043.)

   (735 ILCS 5/13-204) (from Ch. 110, par. 13-204)
   Sec. 13-204. Contribution and indemnity.
   (a)  In  instances  where  no  underlying  action  seeking
recovery for injury to or death of a person or injury or
damage to property has been filed by a claimant, no action for
contribution or indemnity may be commenced with respect to any
payment made to that claimant more than 2 years after the
party seeking contribution or indemnity has made the payment
in discharge of his or her liability to the claimant.
   (b)  In instances where an underlying action has been filed
by a claimant, no action for contribution or indemnity may be
commenced more than 2 years after the party seeking
contribution or indemnity has been served with process in the
underlying action or more than 2 years from the time the
party, or his or her privy, knew or should reasonably have
known of an act or omission giving rise to the action for
contribution or indemnity, whichever period expires later.
   (c)  The applicable limitations period contained in
subsection (a) or (b) shall apply to all actions for
contribution or indemnity and shall preempt, as to
contribution and indemnity actions only, all other statutes of
limitation or repose, but only to the extent that the claimant
in an underlying action could have timely sued the party from
whom contribution or indemnity is sought at the time such
claimant filed the underlying action, or in instances where no
underlying action has been filed, the payment in discharge of
the obligation of the party seeking contribution or indemnity
is made before any such underlying action would have been
barred by lapse of time.
   (d)  The provisions of this Section, as amended by Public
Act 88-538, shall be applied retroactively when substantively
applicable, including all pending actions without regard to
when the cause of action accrued; provided, however, that this
amendatory Act of 1994 shall not operate to affect statutory
limitations or repose rights of any party which have fully
vested prior to its effective date.
   (e)  The provisions of this Section shall not apply to any
action for damages in which contribution or indemnification is
sought from a party who is alleged to have been negligent and
whose negligence has been alleged to have resulted in injuries
or death by reason of medical or other healing art
malpractice.
(Source: P.A. 88-538; 89-626, eff. 8-9-96.)

   (735 ILCS 5/13-205) (from Ch. 110, par. 13-205)
   Sec. 13-205. Five year limitation. Except as provided in
Section 2-725 of the "Uniform Commercial Code", approved July
31, 1961, as amended, and Section 11-13 of "The Illinois
Public Aid Code", approved April 11, 1967, as amended, actions
on unwritten contracts, expressed or implied, or on awards of
arbitration, or to recover damages for an injury done to
property, real or personal, or to recover the possession of
personal property or damages for the detention or conversion
thereof, and all civil actions not otherwise provided for,
shall be commenced within 5 years next after the cause of

*Five years Statue of Limitations"* [handwritten annotation]

PLAINTIFF
EXHIBIT
E

Case: 1:13-cv-02533 Document #: 1 Filed: 04/04/13 Page 36 of 60 PageID #:36

735 ILCS 5/ Code of Civil Procedure.                                    Page 16 of 28

action accrued.
(Source: P.A. 82-280.)

    (735 ILCS 5/13-206) (from Ch. 110, par. 13-206)
    Sec. 13-206. Ten year limitation. Except as provided in
Section 2-725 of the "Uniform Commercial Code", actions on
bonds, promissory notes, bills of exchange, written leases,
written contracts, or other evidences of indebtedness in
writing and actions brought under the Illinois Wage Payment
and Collection Act shall be commenced within 10 years next
after the cause of action accrued; but if any payment or new
promise to pay has been made, in writing, on any bond, note,
bill, lease, contract, or other written evidence of
indebtedness, within or after the period of 10 years, then an
action may be commenced thereon at any time within 10 years
after the time of such payment or promise to pay. For purposes
of this Section, with regard to promissory notes dated on or
after the effective date of this amendatory Act of 1997, a
cause of action on a promissory note payable at a definite
date accrues on the due date or date stated in the promissory
note or the date upon which the promissory note is
accelerated. With respect to a demand promissory note dated on
or after the effective date of this amendatory Act of 1997, if
a demand for payment is made to the maker of the demand
promissory note, an action to enforce the obligation of a
party to pay the demand promissory note must be commenced
within 10 years after the demand. An action to enforce a
demand promissory note is barred if neither principal nor
interest on the demand promissory note has been paid for a
continuous period of 10 years and no demand for payment has
been made to the maker during that period.
(Source: P.A. 95-209, eff. 8-16-07.)

    (735 ILCS 5/13-207) (from Ch. 110, par. 13-207)
    Sec. 13-207. Counterclaim or set-off. A defendant may
plead a set-off or counterclaim barred by the statute of
limitation, while held and owned by him or her, to any action,
the cause of which was owned by the plaintiff or person under
whom he or she claims, before such set-off or counterclaim was
so barred, and not otherwise. This section shall not affect
the right of a bona fide assignee of a negotiable instrument
assigned before due.
(Source: P.A. 83-707.)

    (735 ILCS 5/13-208) (from Ch. 110, par. 13-208)
    Sec. 13-208. Absence from State. (a) If, when the cause of
action accrues against a person, he or she is out of the
state, the action may be commenced within the times herein
limited, after his or her coming into or return to the state;
and if, after the cause of action accrues, he or she departs
from and resides out of the state, the time of his or her
absence is no part of the time limited for the commencement of
the action.
    (b) For purposes of subsection (a) of this Section no
person shall be considered to be out of the State or to have
departed from the State or to reside outside of the State
during any period when he or she is subject to the
jurisdiction of the courts of this State with respect to that
cause of action pursuant to Sections 2-208 and 2-209 of this

PLAINTIFF
EXHIBIT
E

Page 1

"Note" date )

Memorandum for the Record

Wayne Johnson - New York

November 8, 1968

F. M. Edwards - Toledo
A. S. Kevlin - New York
J. F. Vyvarberg - New York

Asbestos content of Kayla is about 15%, composed of 12-13% Amosite mined in Africa and 3% Chrysotile mined in Canada.

Wayne Johnson

WJ:dt

"Product liability"
harmful product
"7 pages"
tickled to the law 13 pages

PLAINTIFF
EXHIBIT
F

*Page 2*



"Note" date

1966

Mechanical piping system. 2.5
January, 1966

## Pipe Insulation



### Kaylo Pipe Insulation

*for hot water heating, high temperature
hot water, steam condensate piping systems and
all heated lines to 1200F*



### uses

Kaylo is particularly suitable for use on high temperature piping systems where high performance and extended temperature range are required. Kaylo is widely used on hot piping where a great degree of physical abuse resistance is required, such as boiler and equipment rooms.

### description

Kaylo Pipe Insulation is a rigid white hydrous calcium silicate insulation molded in sections for all types of indoor and outdoor piping that requires an abuse resistant, durable, efficient insulation, for temperatures up to 1200F.

### benefits

**rugged**—Kaylo Pipe Insulation is a strong and rigid material that resists mechanical damage during shipping, installation and service. It is well suited for riser piping in exposed locations.

**versatile**—Kaylo's extended temperature range offers wider use for all hot piping to 1200F.

**will not cause stress corrosion cracking**—Kaylo will not cause stress corrosion cracking of stainless steel because Kaylo contains an inhibitor and has less than 200 ppm soluble chlorides.

**unaffected by moisture**—Kaylo can be completely saturated in water without appreciable loss of strength and regains its strength and thermal value after drying out.



Kaylo Pipe Insulation cuts cleanly with straight square lines. The final result is well insulated piping with a neat finished appearance. Mitered fittings are finished with insulating cement and covered with canvas.
T.M. REG. OCF CORP.



Kaylo Steel Pipe Insulation combines weatherproofing and insulation in one application. Attractive, maintenance-free factory-applied jackets of stainless steel and aluminum are complete with longitudinal locking seams and end joint butt strips.

*Unprotected pipe covering is shown in this picture*

PLAINTIFF
EXHIBIT
F

"Product liability"
harmful product

C00027

*Page 3*



1960

power & process piping systems 5.3
January, 1960

*Pipe Insulation*



**Kaylo & Kaylo 20 Pipe Insulations**

*rigid hydrous calcium silicate pipe insulations for heated piping up to 1800F.*

## uses

Standard Kaylo is recommended for use on heated pipe operating up to 1200F and Kaylo 20 extends the temperature range to 1800F. These thoroughly field-tested insulators have the physical properties most desirable for efficient, durable work for indoor and outdoor, power and process piping. A variety of jackets are available for surface finish and weatherproofing.

## description

Kaylo® & Kaylo 20° pipe insulations are rigid hydrous calcium silicate heat insulations for use on all heated piping up to 1800F — indoors and out. These products are precision molded in sections or segments from a chemical reacted material. A small amount of asbestos fiber is added to improve mechanical strength. Kaylo is white. Kaylo 20 has a slight pinkish color to distinguish it from Kaylo.

## benefits

**lower operating costs** — Kaylo insulations have exceptional thermal efficiency. The low k factor of .37 at 200 mean temperature means lower operating cost, better temperature control for process operations.

**rugged** — Kaylo Pipe Insulations are strong and rigid to resist mechanical abuse in shipping, handling and in service.

**versatile** — Kaylo's extended temperature range covers a broad number of uses with one material. All heated piping requirements to 1800F and in sizes from ½" to 30" IPS can be met with Kaylo and Kaylo 20.

**will not cause stress corrosion cracking** — Kaylo will not cause stress corrosion cracking of stainless steel because Kaylo contains an inhibitor, and has low soluble chlorides.

**unaffected by moisture** — Kaylo can be completely saturated with water without appreciable loss of strength and regains its strength and thermal value after drying out.

**clean, neat installation** — Kaylo cuts cleanly leaving a sharp square edge for neater appearance on fittings. Rigid manufacturing tolerances assure uniform, smooth, unbroken joints.

**variety of jackets** — A variety of factory-applied jackets allows a selection of product for indoor finished appearance or for weatherproofing insulation on outdoor lines.

**nesting sizes** — Kaylo and Kaylo 20 Pipe Insulations are manufactured to Simplified Dimensional Standards to permit nesting sizes for double layer applications.

REG. OFF. CORP.

PLAINTIFF
EXHIBIT
F

*Product liability harmful product*

C00025

*Page 4*

## physical properties

density.......approximately 11 lbs. per cu. ft.
flexural strength (ASTM C-203) over 50 lb.
                  per sq. in.
resistance to abrasion
  (conventional tumbling test-loss in weight
  after 10 min.)
    before heating.....................9%
    after heating for 24 hours
      at 750 F.......................5%
      at 1000 F......................4%
      at 1200 F......................3%
alkalinity ...........................ph 10
dimensional stability
linear shrinkage after heating for 24 hours in
muffle
    at 750 F.......................0.8%
    at 1000 F......................0.9%
    at 1200 F......................1.4%
specific heat .....................0.22 Btu/lb.F.

thermal conductivity



### specification compliance

HH-00523b: Insulation Block, Pipe Covering and Cement, Thermal, Calcium silicate (For temperatures up to 1200F) Type II (Pipe covering) Classes A thru E.

MIL-I-2781D Insulation Pipe Covering, Thermal, Grade 1, Class B; Grade 2, Class D; Grade 3, Class E, Type 1 and 2.

### economic thickness—ambient air at 80F

| Pipe Temp. IPS | 200°–120° ET | NL | ST | 400°–320° ET | NL | ST | 600°–520° ET | NL | ST |
|---|---|---|---|---|---|---|---|---|---|
| ½ | 1 | 17 | 15 | 1½ | 40 | 105 | 2 | 63 | 113 |
| ¾ | 1 | 19 | 17 | 1½ | 42 | 110 | 2 | 65 | 117 |
| 1 | 1 | 20 | 15 | 1½ | 45 | 100 | 2½ | 70 | 107 |
| 1¼ | 1 | 24 | 19 | 2 | 52 | 104 | 2½ | 80 | 111 |
| 1½ | 1 | 28 | 22 | 2 | 55 | 102 | 2½ | 84 | 112 |
| 2 | 1½ | 32 | 19 | 2 | 58 | 104 | 2½ | 90 | 110 |
| 2½ | 1½ | 40 | 22 | 2 | 64 | 103 | 3 | 94 | 105 |
| 3 | 1½ | 33 | 93 | 2 | 79 | 104 | 3 | 111 | 110 |
| 4 | 1½ | 33 | 91 | 7½ | 72 | 99 | 3 | 111 | 108 |
| 6 | 1½ | 38 | 88 | 2½ | 83 | 107 | 3½ | 153 | 108 |
| 8 | 1½ | 40 | 87 | 2½ | 102 | 105 | 3½ | 120 | 107 |
| 10 | 1½ | 43 | 55 | 2½ | 94 | 105 | 3½ | 137 | 110 |

| Pipe Temp. IPS | 200°–120° ET | NL | ST | 400°–320° ET | NL | ST | 600°–520° ET | NL | ST |
|---|---|---|---|---|---|---|---|---|---|
| ½ | 2 | 46 | 92 | 3 | 98 | 100 | 4 | 149 | 104 |
| ¾ | 2 | 47 | 92 | 3 | 101 | 105 | 4 | 155 | 104 |
| 1 | 2 | 55 | 93 | 3 | 115 | 108 | 4 | 188 | 108 |
| 2 | 2 | 58 | 91 | 3 | 123 | 107 | 4 | 182 | 110 |
| 5 | 2 | 65 | 91 | 3½ | 124 | 98 | 4 | 200 | 107 |
| 10 | 2 | 73 | 92 | 3½ | 133 | 99 | 4 | 205 | 102 |
| 12 | 2 | 74 | 92 | 3½ | 142 | 97 | 4 | 210 | 104 |
| 14 | 2½ | 78 | 92 | 3½ | 157 | 99 | 4½ | 273 | 101 |
| 16 | 2 | 70 | 98 | 4 | 159 | 97 | 4 | 207 | 97 |
| 18 | 2 | 71 | 98 | 3 | 147 | 92 | 4 | 212 | 97 |
| 20 | 3 | 78 | 98 | 4 | 147 | 98 | 4½ | 246 | 101 |
| 24 | 3 | 100 | 99 | 4 | 176 | 93 | 4½ | 266 | 97 |

### economic thickness

table notes:
ET — economic thickness (inches)
NL — heat loss (Btu/sq. ft. hr)
ST — surface temperature (F)

procedure of specifying economic thickness...

pipe sizes—Kaylo Pipe Insulation is available in nominal pipe sizes from ½" to 39" in diameter, and nominal copper tubing sizes from ⅜" to 3" in diameter. It is manufactured to Dimensional Standards Sizes to permit nesting in multiple-layer applications.

forms—Kaylo Pipe Insulation is available in sectional or multisegmental form depending upon pipe size. All insulation is furnished in 3 ft. sections.

### jackets

Jackets are factory-applied on Sectional Pipe and Tube Insulation. On Multisegmental forms they are furnished but not adhered.

canvas—Kaylo Sectional Pipe Insulation includes standard canvas jackets, at no additional charge, on thicknesses up to and including 3" depending on pipe size.

6 oz. and 8 oz. canvas jackets are available for all types, sizes and thicknesses of Kaylo Pipe and Tube Insulation at an additional charge.

smooth and embossed aluminum—Kaylo is also available with smooth or embossed aluminum jacket .016" thick; or stainless steel .010". These weatherproof jackets provide greater resistance to mechanical damage and present a neat finished appearance to outdoor pipe lines. The longitudinal seam has a self-locking joint. Butt sealing strips are furnished with an integral weatherproof mastic for sealing end joints. For additional information refer to Data Sheet on Kaylo Klad Pipe Insulation.

**OWENS-CORNING FIBERGLAS CORPORATION**
Industrial and Commercial Construction Materials Division, 717 Fifth Avenue, New York, New York 10022
General Offices, Toledo.

---

*(handwritten)* "Product Liability" Harmful Product

*(handwritten)* Note "date" 1966

PLAINTIFF
EXHIBIT
F

C00028

Page 5

## physical properties

| | Kaylo | Kaylo 20 |
|---|---|---|
| density — approximately | 11 lb. pcf. | 12 lb. pcf. |
| flexural strength (ASTM C-203) | 50 lbs. /sq. in. | 90 lbs. /sq. in. |
| compressive strength (ASTM C-165) at 5% deformation | 120 psi | 130 psi |
| resistance to abrasion (Conventional tumbling test-loss in weight after 20 min.) before heating | — 9% | 3% |
| after heating for 24 hr. at 750° | — 5% | 1200°F — 5% |
| at 1000° | — 4% | 1800°F — 20% |
| at 1200° | — 3% | |
| alkalinity | ph 10 | ph 10 |
| corrosion resistance | does not cause or accelerate corrosion of steel, aluminum or stainless steel | |
| dimensional stability linear shrinkage after heating for 24 hrs. in a muffle at 750° | — 0.8% | 1200° — 0.7% |
| at 1000° | — 0.9% | 1800° — 1.6% |
| at 1200° | — 1.4% | |
| specific heat | 0.22 btu /lb.F | 0.22 btu /lb.F |
| thermal diffusivity sq. ft./hr. at 200F mean Temp. | 0.012 | 0.016 |

thermal conductivity

### sizes

**thickness** — Kaylo Pipe Insulation is available in single or double layer thicknesses from 1" to 3" depending upon pipe size. Kaylo Tube Insulation is available in single layer thicknesses of 1" and 1½".

**pipe sizes** — Kaylo Pipe Insulation is available to fit nominal pipe sizes from ½" to 35" in diameter. Kaylo Tube Insulation to fit nominal copper tubing sizes from ⅜" to 3" in diameter.

**forms** — Kaylo Pipe Insulation is available in sectional or multi-segmental form depending upon pipe size. All insulation is furnished in 3 ft. sections.

**jackets**

**canvas** — Kaylo Sectional Pipe Insulation includes standard canvas jackets, at no additional charge. On thicknesses up to and including 3", depending on pipe size. Standard canvas is available in multi-segmental forms at a slight additional cost. Bends are available for use with the product at slight additional charge and can be furnished on request.

For 6 and 8 oz. canvas jackets are available for all types, these are canvases of Kaylo Pipe and Tube Insulation at an additional charge. These jackets are factory applied on Sectional Pipe and Tube Insulation. On Multisegmental forms, they are furnished but not adhered.

**Kaylo Clad** — Kaylo is also available with an embossed aluminum jacket .016" thick or .020" thick stainless steel jacket. These jackets provide greater resistance to mechanical damage and present a neat finished appearance to pipe lines. The longitudinal seam has a self-locking joint. Butt sealing bands with integral mastic and protective asbestos cover are furnished for sealing end joints. See data sheet—for complete information on Kaylo Klad.

### federal specification compliance

**HH-I-523b** — Insulation Block and Pipe Covering, Thermal (Calcium Silicate for Temperatures up to 17 /F) Type II (pipe insulation) Class A thru E.

**HH-I-2781D** (Int. Amend. 1) — Insulation Pipe Covering, Thermal Grade I, Class b; Grade II, Class c; Grade III, Class a. Type I & II.

### application recommendations

**outdoor lines** — Kaylo Pipe Insulations are mechanically fastened by wiring in place using 16 gauge wire on 9" centers and subsequently covered with a weatherproof jacket of metal or 45 lb. roofing felt. See Application Specifications for complete details.

**indoor lines** — Kaylo for indoor piping work is furnished with a factory-applied canvas jacket and held in place with bands or wire. The jacket has overlapping joint flaps that are smoothly pasted in place. Canvas should be sized to provide a base for painting.

**fittings** — Fittings are insulated with mitered segments of Kaylo wired in place and finished with a ¼" layer of insulating cement. Flanges and valves are insulated with oversized pipe insulation. They are finished off with canvas pasted in place for indoor lines or reinforced waterproof mastic for outdoor lines.



"Product liability"
harmful product

PLAINTIFF
EXHIBIT
F

Unprotected
Pipe Covering Workers
Without respirators
breathing
Kaylo

C00026

"Note" Date 1966



*Equipment Insulation*




## Kaylo & Kaylo 20 Block Insulation

*rigid calcium silicate insulations for all types of heated equipment operating at temperatures up to 1800F.*

### uses

Kaylo Block is for use on indoor or outdoor equipment operating at temperatures up to 1200F. Kaylo Block is especially suited for use on stainless steel vessels and equipment as it inhibits stress corrosion cracking. Typical applications are for boilers, breeching, tanks, ducts.

Kaylo 20* with its high temperature limit of 1800F extends its use to include refractory wall backing for furnaces and boilers and fireproofing of equipment and vessel skirts.

### description

Kaylo and Kaylo 20 Block Insulations are rigid hydrous calcium silicate heat insulations reinforced with asbestos fibres. They are strong, efficient and are highly resistant to abrasion and moisture damage. Kaylo 20 has a slightly pink color to distinguish it from Kaylo.

Page 6

### benefits

high thermal efficiency—both Kaylo and Kaylo 20 offer excellent thermal efficiency coupled with high strength. A low k of .37 for Kaylo and .43 for Kaylo 20 at 200F mean temperature proves that Kaylo will provide significant savings in operating costs over the life of the equipment.

resistant to abuse—resists mechanical damage because of hard, tough, reinforced structure.

strong—less breakage in shipment and handling. High temperatures have little effect on strength characteristics.

will not cause stress corrosion cracking—Kaylo will not cause stress corrosion cracking of stainless steel because Kaylo contains less than 200 ppm soluble chlorides as well as an inhibitor which prevents trace quantities of chlorides from the

atmosphere or other sources from causing cracking and possible failure of piping and equipment.

resistant to moisture damage—unlike many other insulations. Kaylo is not affected appreciably from moisture damage. It regains thermal efficiency and strength after drying out. Outdoor installations must be weatherproofed, however, for long continuous service.

dimensionally stable—Kaylo does not shrink appreciably in service, even at elevated temperatures. This means less heat leakage at the joints. And Kaylo will not warp or crack in service.

fabricates easily—ordinary insulators tools are all that is required to fabricate Kaylo. It cuts with a clean true edge for tighter fit at the joints. Fittings are neater, faster.

*T.M. REG. OCF CORP.

PLAINTIFF
EXHIBIT
F

"Product liability"
harmful product

# *physical properties*

|  | Standard Kaylo | Kaylo 20 |
|---|---|---|
| density: | 11 psf approx. | 12 psf approx. |
| flexural strength: | over 50 lb/sq. in. (ASTM C-203) | 90 lb/sq. in. |

**compressive strength:** (at 5% deformation)
(ASTM C-165) before heating.
130 lbs. per square inch.

Standard Kaylo: before heating, 150 lb/sq. in.; 144 lb/sq. in. at 750°F; 123 lb/sq. in. at 1000°F; 117 lb/sq. in. at 1200°F; after boiling for 24 hr., 74 lb/sq. in. (while wet).

**resistance to abrasion:** (conventional tumbling test—loss in weight after 10 min.)

|  | standard Kaylo | Kaylo 20 |
|---|---|---|
| before heating | 9% | 5% |
| after heating for 24 hr. | | |
| 750°F | 5% | |
| 1000°F | 4% | |
| 1200°F | 3% | 5% |
| 1800°F | | 20% |

**alkalinity: ph 10**

**dimensional stability: linear shrinkage after heating for 24 hours in muffle**

|  | standard Kaylo | Kaylo 20 |
|---|---|---|
| 750°F | 0.9% | |
| 1000°F | 0.9% | |
| 1200°F | 1.4% | 0.7% |
| 1800°F | | 1.6% |

**thermal conductivity**



**economic thicknesses**

Selection of insulation thicknesses for any specific application should take into consideration the following important criteria. 1. Cost of insulation applied. 2. Cost of heat energy. 3. Cost of depreciation—plant and insulation. 5. Capital investment in heat production equipment. 6. Temperature differential. 7. Size of the pipe or surface. 8. Conductivity of insulation.

For hot piping, the tabulated thicknesses are optimum thicknesses calculated as an "Economic" basis for heat conservation under average operating conditions and ensure adequate temperature control. Other conditions may warrant the use of other thicknesses.

*From "How to Determine Economic Thickness of Insulation"—National Insulation Manufacturers Association.*

**key**
ET—recommended thickness (inches)
HL—heat loss . . . Btu/hr/lineal foot
ST—surface temperature

**Kaylo Block to 1200°F—ambient temperature 80°F**

| Operating Temp. | Commercial | | | Power | | | Process | | |
|---|---|---|---|---|---|---|---|---|---|
|  | ET | HL | ST | ET | HL | ST | ET | HL | ST |
|  |  | 36 | 103 | 1 | 36 | 103 | 1 | 36 | 103 |
|  | 1½ | 50 | 130 | 1 | 60 | 119 | 1 | 60 | 139 |
|  | 2½ | 60 | 100 | 1½ | 74 | 122 | 1 | 105 | 138 |
|  | 3½ | 47 | 102 | 2 | 82 | 126 | 1¼ | 104 | 136 |
|  | 4½ | 48 | 108 | 2½ | 85 | 128 | 1½ | 133 | 140 |
|  |  |  |  | 3 | 80 | 129 | 2 | 127 | 145 |
|  |  |  |  | 4 | 88 | 124 | 2½ | 125 | 144 |
|  |  |  |  | 4½ | 86 | 127 | 3 | 124 | 144 |
|  |  |  |  | 5½ | 80 | 125 | 3½ | 125 | 144 |
|  |  |  |  | 6 | 84 | 126 | 4 | 125 | 143 |
|  |  |  |  | 6½ | 90 | 127 | 4½ | 127 | 143 |

**Kaylo 20 Block to 1800°F—ambient temperature 80°F**

| Operating Temp. F | Power | | | Process | | |
|---|---|---|---|---|---|---|
|  | ET | HL | ST | ET | HL | ST |
| 1300 | 7½ | 111 | 136 | 6 | 135 | 148 |
| 1400 | 8 | 117 | 139 | 6½ | 143 | 152 |
| 1500 | 8 | 123 | 142 | 7 | 152 | 155 |
| 1600 | 8½ | 129 | 145 | 7 | 158 | 150 |
| 17.0 | 9 | 135 | 148 | 7½ | 165 | 163 |
| 1800 | 9½ | 141 | 151 | 7½ | 172 | 165 |

**sizes**

Pipe sizes—½", 1½", 2", 2½", 3", 3½" and 4"
blocks—3", 6", 12" and 18"
36" to 36"
3" block

**insulated lags**

For sizes greater than those for which Kaylo and Kaylo 20 pipe sizes are available, Kaylo and Kaylo 20 beveled lags may be used for insulated piping. Lags beveled to fit pipes from 18" to 36" in diameter are available in thicknesses of 1½", 2½", 3". Lags are 36" long and 3" wide.

**federal specifications**

HH-I-523b: Insulation Block, Pipe Covering, and Cement, Thermal, Calcium Silicate. Type I.
MIL-I-2819D Insulation Block, Thermal. Class 1, 2, & 3. ASTM C533-64T: Kaylo—Class 1 & 2; Kaylo 20—Class 1, 2, 3.

**application recommendations**

Kaylo and Kaylo 20 Block insulations are held in place by mechanically fastening with bands, welded rods or studs. The insulation may be finished with a trowel coat of insulating cement, canvassed and painted. Outdoor installations require weatherproofing with mastics or metal jacketing.

**OWENS-CORNING FIBERGLAS CORPORATION**
Industrial and Commercial
General Offices, 717 Fifth Avenue, New York, New York 10022

*Page 7*

*"Product liability harmful product"*

*"Note Date" 1966*

PLAINTIFF EXHIBIT F

C00021

## Illinois Compiled Statutes

**Information maintained by the Legislative Reference Bureau**
Updating the database of the Illinois Compiled Statutes (ILCS) is an ongoing process. Recent laws may not yet be included in the ILCS database, but they are found on this site as        soon after they become law. For information concerning the relationship between statutes and Public Acts, refer to the       .

Because the statute database is maintained primarily for legislative drafting purposes, statutory changes are sometimes included in the statute database before they take effect. If the source note at the end of a Section of the statutes includes a Public Act that has not yet taken effect, the version of the law that is currently in effect may have already been removed from the database and you should refer to that Public Act to see the changes made to the current law.

**CIVIL PROCEDURE**
**(735 ILCS 5/) Code of Civil Procedure.**

*"6 pages"*

*(added to product)*
*liability 13 pass*

            (735 ILCS 5/Art. II Pt. 21 heading)
                Part 21. Product Liability

        (735 ILCS 5/2-2101)
        (This Section was added by P.A. 89-7, which has been held unconstitutional)
        Sec. 2-2101. Definitions. For purposes of this Part, the terms listed have the following meanings:
        "Clear and convincing evidence" means that measure or degree of proof that will produce in the mind of the trier of fact a high degree of certainty as to the truth of the allegations sought to be established. This evidence requires a greater degree of persuasion than is necessary to meet the preponderance of the evidence standard.
        "Harm" means (i) damage to property other than the product itself; (ii) personal physical injury, illness, or death; (iii) mental anguish or emotional harm to the extent recognized by applicable law; (iv) any loss of consortium or services; or (v) other loss deriving from any type of harm described in item (i), (ii), (iii), or (iv).
        "Manufacturer" means (i) any person who is engaged in a business to design or formulate and to produce, create, make, or construct any product or component part of a product; (ii) a product seller with respect to all component parts of a product or a component part of a product that is created or affected when, before placing the product in the stream of commerce, the product seller designs or formulates and produces, creates, makes, or constructs an aspect of a product or a component part of a product made by another; or (iii) any product seller not described in (ii) that holds itself out as a manufacturer to the user of the product.
        "Product liability action" means a civil action brought on any theory against a manufacturer or product seller for harm caused by a product.
        "Product seller" means a person who, in the course of a business conducted for that purpose, sells, distributes,

*statutory law*

┌─────────────┐
│  PLAINTIFF  │
│   EXHIBIT   │
│      F      │
└─────────────┘

leases, installs, prepares, blends, packages, labels, markets, repairs, maintains, or otherwise is involved in placing a product in the stream of commerce.
(Source: P.A. 89-7, eff. 3-9-95.)

(735 ILCS 5/2-2102)
(This Section was added by P.A. 89-7, which has been held unconstitutional)
Sec. 2-2102. Effect on other laws. Except as may be provided by other laws, any civil action that conforms to the definition of a product liability action as defined in Section 2-2101 of this Part shall be governed by the provisions of this Part.
(Source: P.A. 89-7, eff. 3-9-95.)

(735 ILCS 5/2-2103)
(This Section was added by P.A. 89-7, which has been held unconstitutional)
Sec. 2-2103. Federal and State standards; presumption. In a product liability action, a product or product component shall be presumed to be reasonably safe if the aspect of the product or product component that allegedly caused the harm was specified or required, or if the aspect is specifically exempted for particular applications or users, by a federal or State statute or regulation promulgated by an agency of the federal or State government responsible for the safety or use of the product before the product was distributed into the stream of commerce.
(Source: P.A. 89-7, eff. 3-9-95.)

(735 ILCS 5/2-2104)
(This Section was added by P.A. 89-7, which has been held unconstitutional)
Sec. 2-2104. No practical and feasible alternative design; presumption. If the design of a product or product component is in issue in a product liability action, the design shall be presumed to be reasonably safe unless, at the time the product left the control of the manufacturer, a practical and technically feasible alternative design was available that would have prevented the harm without significantly impairing the usefulness, desirability, or marketability of the product. An alternative design is practical and feasible if the technical, medical, or scientific knowledge relating to safety of the alternative design was, at the time the product left the control of the manufacturer, available and developed for commercial use and acceptable in the marketplace.
(Source: P.A. 89-7, eff. 3-9-95.)

*Statutory law* [handwritten annotation]

PLAINTIFF
EXHIBIT
F

(735 ILCS 5/2-2105)
(This Section was added by P.A. 89-7, which has been held unconstitutional)
Sec. 2-2105. Changes in design or warning; inadmissibility. When measures are taken which, if taken previously, would have made an event less likely to occur, evidence of the subsequent measures is not admissible to prove a defect in a product, negligence, or culpable conduct in connection with the event. In a product liability action brought under any theory or doctrine, if the feasibility of a design change or change in warnings is not controverted, then

a subsequent design change or change in warnings shall not be admissible into evidence. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose such as proving ownership, control, or impeachment.
(Source: P.A. 89-7, eff. 3-9-95.)

(735 ILCS 5/2-2106)
(This Section was added by P.A. 89-7, which has been held unconstitutional)
Sec. 2-2106. Provision of written warnings to users of product; nonliability.
(a) The warning, instructing, or labeling of a product or specific product component shall be deemed to be adequate if pamphlets, booklets, labels, or other written warnings were provided that gave adequate notice to reasonably anticipated users or knowledgeable intermediaries of the material risks of injury, death, or property damage connected with the reasonably anticipated use of the product and instructions as to the reasonably anticipated uses, applications, or limitations of the product anticipated by the defendant.
(b) In the defense of a product liability action, warnings, instructions or labeling shall be deemed to be adequate if the warnings, instructions or labels furnished with the product were in conformity with the generally recognized standards in the industry at the time the product was distributed into the stream of commerce.
(c) Notwithstanding subsections (a) and (b), a defendant shall not be liable for failure to warn of material risks that were obvious to a reasonably prudent product user and material risks that were a matter of common knowledge to persons in the same position as or similar positions to that of the plaintiff in a product liability action.
(d) In any product liability action brought against a manufacturer or product seller for harm allegedly caused by a failure to provide adequate warnings or instructions, a defendant manufacturer or product seller shall not be liable if, at the time the product left the control of the manufacturer, the knowledge of the danger that caused the harm was not reasonably available or obtainable in light of existing scientific, technical, or medical information.
(Source: P.A. 89-7, eff. 3-9-95.)

*of Statutory law 4 pages*

(735 ILCS 5/2-2106.5)
(This Section was added by P.A. 89-7, which has been held unconstitutional)
Sec. 2-2106.5. Inherent characteristics of products; nonliability. In a product liability action, a manufacturer or product seller shall not be liable for harm allegedly caused by a product if the alleged harm was caused by an inherent characteristic of the product which is a generic aspect of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.
(Source: P.A. 89-7, eff. 3-9-95.)

(735 ILCS 5/2-2107)
(This Section was added by P.A. 89-7, which has been held

PLAINTIFF
EXHIBIT
F

unconstitutional)
    Sec. 2-2107. Punitive damages. In a product liability
action, punitive damages shall not be awarded against a
manufacturer or product seller if the conduct of the defendant
manufacturer, seller, or reseller that allegedly caused the
harm was approved by or was in compliance with standards set
forth in an applicable federal or State statute or in a
regulation or other administrative action promulgated by an
agency of the federal or State government responsible for the
safety or use of the product, which statute or regulation was
in effect at the time of the manufacturer's or product
seller's alleged misconduct, unless the plaintiff proves by
clear and convincing evidence that the manufacturer or product
seller intentionally withheld from or misrepresented to
Congress, the State legislature, or the relevant federal or
State agency material information relative to the safety or
use of the product that would or could have resulted in a
changed decision relative to the law, standard, or other
administrative action.
(Source: P.A. 89-7, eff. 3-9-95.)


    (735 ILCS 5/2-2108)
    (This Section was added by P.A. 89-7, which has been held
unconstitutional)
    Sec. 2-2108. No cause of action created. Nothing in this
Part shall be construed to create a cause of action.
(Source: P.A. 89-7, eff. 3-9-95.)


    (735 ILCS 5/2-2109)
    (This Section was added by P.A. 89-7, which has been held
unconstitutional)
    Sec. 2-2109. This amendatory Act of 1995 adding Part 21 to
the Code of Civil Procedure applies to causes of action
accruing on or after its effective date.
(Source: P.A. 89-7, eff. 3-9-95.)

*Statutory Law*

PLAINTIFF
EXHIBIT
F

ILCS 5/ Code of Civil Procedure.                                    Page 8 o

(b) To recover punitive damages in cases described in subsection (a), a plaintiff must show by clear and convincing evidence that the defendant's conduct was with evil motive or with a reckless and outrageous indifference to a highly unreasonable risk of harm and with a conscious indifference to the rights and safety of others. "Clear and convincing evidence" means that measure or degree of proof that will produce in the mind of the trier of fact a high degree of certainty as to the truth of the allegations sought to be established. This evidence requires a greater degree of persuasion than is necessary to meet the preponderance of the evidence standard.

(c) In any action including a claim for punitive damages, a defendant may request that the issues relating to punitive damages be tried separately from the other issues in the action. If such a request is made, the trier of fact shall first hear evidence relevant to, and render a verdict upon, the defendant's liability for compensatory damages and the amount thereof. If the trier of fact makes an award of actual damages, the same trier of fact shall immediately hear any additional evidence relevant to, and render a verdict upon, the defendant's liability for punitive damages and the amount thereof. If no award of actual damages is made, the claim for punitive damages shall be dismissed. If the defendant requests a separate proceeding concerning liability for punitive damages pursuant to this Section, and the proceeding is held, evidence relevant only to the claim of punitive damages shall be inadmissible in any proceeding to determine whether compensatory damages are to be awarded.

(d) The limitations of subsection (a) shall not apply in a case in which a plaintiff seeks damages against an individual on account of death, bodily injury, or physical damage to property based on any theory or doctrine due to an incident or occurrence for which the individual has been charged and convicted of a criminal act for which a period of incarceration is or may be a part of the sentence.

(e) Nothing in this Section shall be construed to create a right to recover punitive damages.

(f) This amendatory Act of 1995 applies to causes of action accruing on or after its effective date.
(Source: P.A. 89-7, eff. 3-9-95.)

(735 ILCS 5/2-1115.1)
(This Section was added by P.A. 89-7, which has been held unconstitutional)

Sec. 2-1115.1. Limitations on recovery of non-economic damages.

(a) In all common law, statutory or other actions that seek damages on account of death, bodily injury, or physical damage to property based on negligence, or product liability based on any theory or doctrine, recovery of non-economic damages shall be limited to $500,000 per plaintiff. There shall be no recovery for hedonic damages.

(b) Beginning in 1997, every January 20, the liability limit established in subsection (a) shall automatically be increased or decreased, as applicable, by a percentage equal to the percentage change in the consumer price index-u during

*statutory law*

PLAINTIFF
EXHIBIT
F

Case: 1:13-cv-02533 Document #: 1 Filed: 04/04/13 Page 49 of 60 PageID #:49

ILCS 5/ Code of Civil Procedure.                                    Page 9

the preceding 12-month calendar year. "Consumer price index-u" means the index published by the Bureau of Labor Statistics of the United States Department of Labor that measures the average change in prices of goods and services purchased by all urban consumers, United States city average, all items, 1982-84 = 100. The new amount resulting from each annual adjustment shall be determined by the Comptroller and made available to the chief judge of each judicial circuit.

(c) The liability limits at the time at which damages subject to such limits are awarded by final judgment or settlement shall be utilized by the courts.

(d) Nothing in this Section shall be construed to create a right to recover non-economic damages.

(e) This amendatory Act of 1995 applies to causes of action accruing on or after its effective date.

(Source: P.A. 95-331, eff. 8-21-07.)

(735 ILCS 5/2-1115.2)

(This Section was added by P.A. 89-7, which has been held unconstitutional)

Sec. 2-1115.2. Economic and non-economic loss. In all actions on account of bodily injury, death, physical damage to property based on negligence, or a product liability action as defined in Section 2-2101, the following terms have the following meanings:

(a) "Economic loss" or "economic damages" means all damages which are tangible, such as damages for past and future medical expenses, loss of income or earnings and other property loss.

(b) "Non-economic loss" or "non-economic damages" means damages which are intangible, including but not limited to damages for pain and suffering, disability, disfigurement, loss of consortium, and loss of society.

(c) "Compensatory damages" or "actual damages" are the sum of economic and non-economic damages.

This amendatory Act of 1995 applies to causes of action filed on or after its effective date.

(Source: P.A. 89-7, eff. 3-9-95.)

(735 ILCS 5/2-1116) (from Ch. 110, par. 2-1116)

(Text of Section WITH the changes made by P.A. 89-7, which has been held unconstitutional)

Sec. 2-1116. Limitation on recovery in tort actions; fault.

(a) The purpose of this Section is to allocate the responsibility of bearing or paying damages in actions brought on account of death, bodily injury, or physical damage to property according to the proportionate fault of the persons who proximately caused the damage.

(b) As used in this Section:

"Fault" means any act or omission that (i) is negligent, willful and wanton, or reckless, is a breach of an express or implied warranty, gives rise to strict liability in tort, or gives rise to liability under the provisions of any State

*Statutory Law*

PLAINTIFF
EXHIBIT
F

*Page 3*

was informed of the strategy and compilation of the asbestos
articles was approved.  (PL Exh 3).

The evidence showed that from its inception, OC used the
health of American workers as a marketing tool.  First, good
health information about its fiberglass products was highly
publicized to workers while OC threatened to tell workers about
the bad health aspect of its competitors' asbestos products.  In
1942 OC's strategy changed when OI developed a new product they
called Kaylo insulation.  Unlike prior OC or OI insulation, Kaylo
contained significant amounts of asbestos.  (PL Exh 19).  The
"strategy for 1942" was not implemented and the next time that OC
would undertake to tell American workers about the dangers of
asbestos was thirty (30) years later when asbestos was removed
from Kaylo.

When Kaylo was first developed, OI hoped that it might not
be as dangerous to workers as other asbestos products.  (PL Exh
18).  To investigate this potential in 1943, OI had Kaylo dust
studied at the Saranac Laboratory.  *Id.*  However almost
immediately,  Mr. Bowes director of OI research and an OC
director, was informed by Saranac that Kaylo dust had "all the
ingredients for a first class hazard".  (PL Exh 19).  In 1944,
Saranac informed OC Director Bowes that Kaylo dust had proven to
be "toxic".  (PL Exh 20).  After further study, in 1948 Bowes was
further advised by Saranac that Kaylo "must be regarded as a
potentially hazardous material."  (PL Exh 14).  In 1952, Saranac
prepared a final written report concerning Kaylo wherein it again
noted the "toxic" properties of Kaylo dust. (PL Exh 16 p.3).

OC claims that the Saranac documents demonstrated only that
Kaylo dust, when inhaled in extraordinary amounts by laboratory
animals over long periods of time, was capable of producing lung
fibrosis characteristic of                    ver, the Saranac

PLAINTIFF
EXHIBIT
G



DC-68-5

**FIBERGLAS** INTRA-COMPANY CORRESPONDENCE

To    Mr. O. W. Pfeifer - Granville      Date   **January 22, 1969**
Dr. W. C. Taylor - Toledo
Mr. M. D. Burch - Toledo
Mr. R. L. Logan, Jr. - Toledo

From   F. H. Edwards - Toledo             *page 4*

Subject   <u>INQUIRIES ABOUT KAYLO</u>

        I have been receiving inquiries from various sources about the health hazards of our Kaylo products and I assume that this will continue. No doubt, Dr. Selikoff's articles have created rather broad concern about this subject. The latest inquiry came from the Navy Department, Washington, D. C.

        The reason for this memo is that I believe you should be kept informed about the status of the situation and that we should continue to give serious consideration to the labeling of our Kaylo products in a manner similar to that currently being used by Johns-Manville. In my opinion, the fact that Johns-Manville is labeling their preformed products is in itself a pressure on the whole industry to consider labeling.

        I do not know how many states will allow suit to be brought against negligent manufacturers despite the existence of a Workmen's Compensation Law. I do know that this may be done in certain states and that if it is done, the amounts requested are usually sizable. This problem is one for our Legal Department to decide.

                                        F. H. Edwards

FHE:JS



*Forseeable
Knowledge
before
1966*

PLAINTIFF
EXHIBIT
G

# THE TRUDEAU FOUNDATION
### FOR
## THE CLINICAL AND EXPERIMENTAL STUDY OF PULMONARY DISEASE

AT SARANAC LAKE, N.Y.

**THE SARANAC LABORATORY**
THE TRUDEAU FOUNDATION
THE TRUDEAU SCHOOL

AT TRUDEAU, N.Y.

THE DEPARTMENT OF PHYSIOLOGY
THE DEPARTMENT OF BIOCHEMISTRY
THE DEPARTMENT OF RADIOLOGY
THE TRUDEAU LABORATORY

February 7, 1952

Page 1

Mr. W. G. Hazard
Industrial Relations Division
Owens-Illinois Glass Company
Toledo 1, Ohio

Dear Bill:

    Herewith is the final report of our studies concerning The Capacity of Inhaled Kaylo Dust to Injure the Lung. We are enclosing four copies for distribution by you. One copy has been sent to Doctor Shook for his information and we are retaining a copy for our files.

    The results of the investigations with animals show that Kaylo dust is capable of producing a peribronchiolar fibrosis typical of asbestosis. The dust also has a slightly unfavorable influence upon a tuberculous infection. Although extrapolation from animal to human experience is difficult, nevertheless the results of the study indicate that every precaution should be taken to protect workers against inhaling the dust. Therefore, control measures should be directed to reducing the amount of atmospheric dust, especially at those points of operation where dust is generated. Our report of May 29, 1951 concerning the industrial hygiene survey may be of help to you in this regard.

    We hope to publish this study either separately or in combination with similar studies pertaining to other dust. In doing so, however, reference will be made only to hydrous calcium silicate and not to "Kaylo;" thus the interest of your Company will be safeguarded. Of course the final manuscript will be forwarded to you for review before being released to the publisher. Your comment in this regard would assist us greatly in preparing the manuscript.

    In submitting this final report, may I express to you and others of the Company our sincere appreciation for having had the privilege of collaborating with the Owens-Illinois Glass Company in the study of Kaylo. The collaboration has always been most pleasant and stimulating.

    My every best wish.

Sincerely yours,

Arthur J. Vorwald, M.D.
Director

AJV:LB
Encs. (4)
CC: C. F. Shook, M.D.

*Sensible Knowledge before #166*

*+ Salutation "8 pages"*

PLAINTIFF
EXHIBIT
G





report unequivocally advised OC that "very small numbers of [asbestos] fibers" are capable of producing asbestos disease. (PL Exh 15 p.6-7). As OC president John Thomas testified, the Saranac studies should have been a "red flag" (T545), and we should have warned the workers at that time. (T545).

In 1953, OC became the national distributor of Kaylo which continued to be manufactured by OI.

In 1956, OC's medical consultant and director of Saranac Laboratories, Dr. Schepers, wrote to OC advising them, "I suppose you already know that asbestos is fairly well incriminated as a carcinogen". (PL Exh 88 p.5). OC's response to Dr. Schepers' letter was:

> This is certainly not what I had in mind when I asked Dr. Schepers to give us a letter incorporating favorable statements based upon past experiments with fiberglass in the laboratory. I personally do not like the general tenor of the letter. It is certainly nothing that we could show customers or a union.

(PL Exh 98). Dr. Schepers was correct that by 1956 OC had already learned that asbestos was carcinogenic. In fact, OC had been advised eleven years before, that asbestos caused cancer of the pleura, the cancer that Mr. Ballard developed. (PL Exh 63 p.3).[5]

Despite all that it knew in 1956 concerning the danger which Kaylo presented to workers, and specifically that Kaylo was a "toxic" carcinogen, OC claimed in its sales brochure that Kaylo was:

---

[5]In the 1940's OC was a member of an organization known as the Industrial Health Foundation (IHF). The IHF produced for its members a periodical known as the IHF Digest. In the January, 1945 issue of the IHF Dige͏͏ ͏ ͏ ͏ ͏ medical research appeared stating that cance ͏ ͏ ͏ was caused by exposure to asbestos. (PL Exh 63).

forseeble
Knowledge
before 1966

PLAINTIFF
EXHIBIT
G

Kaylo-20 products are presently available on a made-to-order basis only. Properties and characteristics have been determined from laboratory tests only. Data is subject to change without notice and is subject to normal manufacturing and testing tolerances.



Kaylo-20 Pipe Insulation is adaptable to vessels of unconventional size and shape. Used on pipes, breechings, ducts and boilers, it is shown here on steam lines of a power station's turbines.

## physical properties

**density:**
approximately 12 lbs. per cu. ft.

**flexural strength:**
50 lbs. per sq. in.

*Page 1*

**compressive strength:**
100 lbs. per sq. in. at 5% deformation.

**dimensional stability:**
(linear shrinkage after heating for 6 hours at 1800 F.)
less than 1.5%

**moisture absorption** (by volume):
(after 6 hours exposure in atmosphere at 120° F. and 90% relative humidity) 0.9%

**working temperature:**
up to 1800 F.    *"Note" NO WARNING*

# design·data

The table below has been developed to serve as a guide to recommended thicknesses for Kaylo-20 Pipe Insulation. These are average figures and may be adjusted to meet special conditions encountered on specific jobs. Kaylo heat loss data is available for use where plant operating economics and other conditions demand greater insulation thicknesses.

## recommended thicknesses

| nom. pipe size | temp. difference—hot surface to air, deg. F. | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1100 | 1200 | 1300 | 1400 | 1500 | 1600 | 1700 | 1800-1880 |
| ½ | 2½ | 3 | 3 | 3½ | 3½ | 4 | 4½ | 4½ |
| ¾ | 2½ | 3 | 3 | 3½ | 3½ | 4 | 4½ | 4½ |
| 1 | 2½ | 3 | 3 | 3½ | 3½ | 4 | 4½ | 5 |
| 1¼ | 2½ | 3 | 3 | 3½ | 4 | 4½ | 5 | 5 |
| 1½ | 3 | 3 | 3 | 3½ | 4 | 4½ | 5 | 5½ |
| 2 | 3 | 3 | 3½ | 4 | 4½ | 4½ | 5 | 5½ |
| 2½ | 3½ | 3½ | 4 | 4 | 4½ | 5 | 5½ | 6 |
| 3 | 3½ | 3½ | 4 | 4 | 4½ | 5 | 5½ | 6 |
| 3½ | 3½ | 4 | 4½ | 4½ | 5 | 5½ | 6 | 6½ |
| 4 | 3½ | 4 | 4½ | 4½ | 5 | 5½ | 6 | 6½ |
| 6 | 4 | 4½ | 5 | 5 | 5½ | 6 | 6½ | 7 |
| 8 | 4½ | 4½ | 5 | 5 | 5½ | 6 | 6½ | 7 |
| 10 | 4½ | 5 | 5 | 5½ | 6 | 6½ | 7 | 7½ |
| 12 | 5 | 5 | 5½ | 5½ | 6 | 6½ | 7 | 7½ |
| 14 | 5 | 5½ | 5½ | 6 | 6½ | 7 | 7½ | 8 |
| 16 | 5 | 5½ | 6 | 6½ | 7 | 7½ | 8 | 8½ |
| 18 | 5 | 5½ | 6 | 6½ | 7 | 7½ | 8 | 8½ |
| 20 | 5½ | 6 | 6½ | 7 | 7½ | 8 | 8½ | 9 |
| 24-72 | 5½ | 6 | 6½ | 7 | 7½ | 8 | 8½ | 9 |

For temperatures up to 1000 F. use standard Kaylo recommended thicknesses listed in IN6.A2.

*Unprotected asbestos Kaylo pipe Covering insulation Worker With no respirator mask, breathing toxic asbestos Kaylo Material*



Light in weight, Kaylo-20 Pipe requires no special application techniques.

*No Warning To use a respirator Compliant pg 3-4*

*ra(11)*

PLAINTIFF
EXHIBIT
H

01 009 0840



*Kaylo Heat Insulation is easily cut with ordinary tools.*

*Boiling water does not break it down.*

*Light weight combined with high strength.*

## HYDROUS CALCIUM SILICATE

**Kaylo Heat Insulation** is made of a chemical compound of lime and silica developed by Owens-Illinois Glass Company. Although not glass, it is made of materials similar to those used in glass, and with which Owens-Illinois has had long experience. The technical name is hydrous calcium silicate. Since it is a chemically reacted material, it contains no added binder. For mechanical effects, a small amount of asbestos fiber is included at the time of manufacture.

Few materials have been so thoroughly tested. Owens-Illinois began work on hydrous calcium silicates in 1938, but no material was offered to the general market until 1943. Thousands of installations since that time have proved field superiority, yet research and product development are still continuing.

Kaylo Heat Insulation is made both as block and as molded pipe insulation, with the widest range of sizes, forms and thicknesses of any high temperature insulation available. Kaylo hydrous calcium silicate combines the most desirable physical characteristics of heat insulating materials to a degree not equalled by other materials on the market. This means outstanding performance and economical application for the user.

Kaylo Heat Insulation is *effective* efficiently on temperatures throug pressure steam range and also thr super-heated steam range. There

be used for high temperatures which usually require combinations of two different insulating materials.

The *low coefficient of conductivity*, or "k", of Kaylo Heat Insulation places it among the most efficient insulations for temperatures up to 1200°F. (The name "Kaylo" is derived from the fact that "k" is low for the material.) Its high insulation value comes from the extremely small pore structure. So small and numerous are its insulating air spaces that they present a material internal surface of approximately 100 acres per cubic foot of insulation.

*Water does not break down Kaylo Heat Insulation.* Even when saturated, it retains an appreciable percentage of its strength. After being soaked for long periods of time and then dried, it returns to its original thermal efficiency and strength, without apparent shrinking or warping.

*Kaylo Heat Insulation is effective after long service.* It remains strong and efficient over the years and shows little shrinkage after exposure to temperatures up to 1200°F.

With a weight of only *11 pounds per cubic foot*, handling, shipping and application are simplified.

Kaylo Heat Insulation has flexural strength, compressive *strength and resistance to abrasion far above normal requirements* for heat insulation. Breakage during installation, therefore, is usually negligible.

Block or pipe insulation *can be cut, scored or sawed with ordinary tools* of the trade. The material is *non-irritating to the skin* and non-toxic.

PLAINTIFF

EXHIBIT

H

01 009 0831

Page 3    1966 →    technical piping system. 3.5
January, 1966



## Pipe Insulation

## Kaylo Pipe Insulation

*for hot water heating, high temperature
hot water, steam condensate piping systems and
all heated lines to 1200F*



## uses

Kaylo is particularly suitable for use on high tempera-
ture piping systems where high performance and ex-
tended temperature range are required. Kaylo is widely
used on hot piping where a great degree of physical
abuse resistance is required, such as boiler and equip-
ment rooms.

## description

Kaylo Pipe Insulation is a rigid white hydrous calcium
silicate insulation molded in sections for all types of
indoor and outdoor piping that requires an abuse
resistant, durable, efficient insulation, for tempera-
tures up to 1200F.

## benefits



**rugged**—Kaylo Pipe Insulation is a strong and rigid
material that resists mechanical damage during ship-
ping, installation and service. It is well suited for riser
piping in exposed locations.

**versatile**—Kaylo's extended temperature range offers
broader use for all hot piping to 1200F.

**will not cause stress corrosion cracking**—Kaylo will
not cause stress corrosion cracking of stainless steel
because Kaylo contains an inhibitor and has less than
200 ppm soluble chlorides.

**unaffected by moisture**—Kaylo can be completely
saturated in water without appreciable loss of strength
and regains its strength and thermal value after
drying out.



Kaylo Pipe Insulation cuts cleanly with straight square
lines. The final result is well insulated piping with a
neat finished appearance. Mitered fittings are finished
with insulating cement and covered with canvas.
T.M. REG. OCF CORP.



Kaylo Klad Pipe Insulation combines weatherproofing
and insulation in one application. Attractive, mainte-
nance-free factory-applied jackets of stainless steel and
aluminum are complete with longitudinal locking seams
and end joint butt straps.

PLAINTIFF
EXHIBIT
H

Unprotected pipe covering
insulator in this picture

## *physical properties*

density.......approximately 11 lbs. per cu. ft.
flexural strength (ASTM C-203) over 50 lb.
   per sq. in.
resistance to abrasion
   (conventional tumbling test-loss in weight
   after 10 min.)
   before heating...........................9%
   after heating for 24 hours
      at 750 F.............................5%
      at 1000 F............................4%
      at 1200 F............................3%
alkalinity .............................ph 10
dimensional stability
   linear shrinkage after heating for 24 hours in
   muffle
      at 750 F.............................0.8%
      at 1000 F............................0.9%
      at 1200 F............................1.4%
specific heat ...............0.22 Btu/lb.F.

thermal conductivity



### specification compliance

HH-00523b Insulation Block, Pipe Covering and Cement, Thermal, Calcium silicate (For temperatures up to 1200F) Type II (Pipe covering) Classes A thru E.

MIL-I-2781D Insulation Pipe Covering, Thermal, Grade 1, Class B; Grade 2, Class D; Grade 3, Class E, Type 1 and 2.

### economic thickness—ambient air at 80F

| Pipe Temp. °F | | 200 / 120 HR | | | 400 / 320 HR | | | 600 / 520 HR | |
|---|---|---|---|---|---|---|---|---|---|
| IPS | ET | HL | ST | ET | HL | ST | ET | HL | ST |
| ½ | 1 | 17 | 95 | 1½ | 40 | 106 | 2 | 63 | 113 |
| ¾ | 1 | 19 | 97 | 1½ | 47 | 110 | 2 | 71 | 117 |
| 1 | 1 | 20 | 95 | 1½ | 50 | 106 | 2½ | 70 | 107 |
| 1¼ | 1 | 24 | 99 | 2 | 52 | 104 | 2½ | 81 | 111 |
| 1½ | 1 | 22 | 98 | 2 | 55 | 104 | 2½ | 84 | 112 |
| 2 | 1 | 2 | 98 | 2 | 60 | 104 | 2½ | 96 | 112 |
| 2½ | 1½ | 26 | 98 | 2 | 64 | 103 | 3 | 98 | 105 |
| 3 | 1½ | 32 | 93 | 2 | 79 | 104 | 3 | 111 | 110 |
| 3½ | 1½ | 33 | 97 | 2½ | 72 | 99 | 3 | 115 | 106 |
| 4 | 1½ | 35 | 95 | 2½ | 73 | 107 | 3½ | 118 | 105 |
| 6 | 1½ | 36 | 93 | 2½ | 72 | 107 | 3½ | 120 | 107 |
| 8 | 1½ | 43 | 95 | 2½ | 94 | 105 | 3½ | 137 | 110 |

### economic thickness

table one
economic thickness (inches)
HL—heat loss (Btu/eff. hr.)
ST—surface temperature (F)

*importance of specifying economic thickness*

Selecting insulation thicknesses for any specific application should take into consideration at least the following criteria. 1. Insulation product. 2. Cost of heat energy. 3. Cost of ... 4. Cost of depreciation—plant and insulation. 5. Capital investment in heat production equipment. 6. Temperature differential. 7. Size of the pipe or surface. 8. Conductivity of ...

For determining, the tabulated thicknesses are optimum thicknesses calculated on an "Economic" basis for heat conservation. However severe operating conditions and assure adequate protection. Thermal/Energy conditions may warrant the use of ...

"... How to Determine Economic Thickness of Insulation"—National Insulation Manufacturers Association. Thickness—Heated Piping to 1200F (80F ambient) ...

sizes
forms—Kaylo Pipe Insulation is available in single layer thicknesses from 1" to 3" depending upon pipe size. Kaylo Copper Tubing Insulation is available in single layer thicknesses to 1½".

### MIL-I-2781D

| Pipe Temp. Temp. DHL IPS | | 200 / 100 | | | 400 / 320 | | | 600 / 520 | |
|---|---|---|---|---|---|---|---|---|---|
| | ET | HL | ST | ET | HL | ST | ET | HL | ST |
| 6 | 2 | 46 | 91 | 3 | 98 | 100 | 4 | 149 | 106 |
| 8 | 2 | 47 | 92 | 3 | 104 | 103 | 4 | 156 | 106 |
| 9 | 2 | 55 | 91 | 3 | 115 | 108 | 4 | 169 | 152 |
| 10 | 2 | 56 | 92 | 3 | 123 | 102 | 4 | 176 | 132 |
| 10 | 2 | 65 | 91 | 3½ | 124 | 98 | 4 | 200 | 107 |
| 11 | 2 | 73 | 92 | 3½ | 136 | 98 | 4 | 205 | 197 |
| 12 | 2 | 81 | 92 | 3½ | 142 | 98 | 4½ | 210 | 104 |
| 14 | 2½ | 72 | 90 | 3½ | 157 | 99 | 5 | 213 | 102 |
| 16 | 3 | 78 | 90 | 4 | 159 | 97 | 6 | 207 | 99 |
| 18 | 3 | 81 | 89 | 5 | 147 | 92 | 6½ | 212 | 91 |
| 20 | 3 | 90 | 89 | 5 | 151 | 93 | 6½ | 229 | 92 |
| 24 | 3 | 100 | 89 | 5 | 176 | 93 | 6½ | 266 | 95 |

pipe sizes—Kaylo Pipe Insulation is available in nominal pipe sizes from ½" to 39" in diameter, and nominal copper tubing sizes from ⅜" to 3" in diameter. It is manufactured to Dimensional Standards Sizes to permit nesting in multiple-layer applications.

forms—Kaylo Pipe Insulation is available in sectional or multi-segmental form depending upon pipe size. All insulation is furnished in 3 ft. sections.

jackets
Jackets are factory-applied on Sectional Pipe and Tube Insulation. On Multisegmental forms they are furnished but not adhered.

canvas—Kaylo Sectional Pipe Insulation includes standard canvas jackets, at no additional charge, on thicknesses up to and including 3" depending on pipe size.

6 oz. and 8 oz. canvas jackets are available for all types, sizes and thicknesses of Kaylo Pipe and Tube Insulation at an additional charge.

smooth and embossed aluminum—Kaylo is also available with smooth or embossed aluminum jacket .016" thick; or stainless steel .010". These weatherproof jackets provide greater resistance to mechanical damage and present a neat finished appearance to outdoor pipe lines. The longitudinal seam has a self-locking joint. Butt sealing strips are furnished with an integral weatherproof mastic for sealing end joints. For additional information refer to Data Sheet on Kaylo Klad Pipe Insulation.



**OWENS-CORNING** CORPORATION
Industrial and Commercial ... Division, 717 Fifth Avenue, New York, New York 10022
General Offices, To... ...t Division, Santa Clara, California 95052

Pub. No. 1-IN-3767

Litho in U.S.A. 1/66

PLAINTIFF
EXHIBIT
H

Page 4 · K166

OWENS-CORNING FIBERGLAS CORPORATION

Intra-Company Correspondence

TO:  V. Vandivort – Toledo

FROM:  A. S. Kevlin – New York

SUBJECT: KAYLO CARTONS

DATE: ~~December 28, 1966~~ December 28, 1966

CC: John Vyverberg – New York
J. M. Briley – Toledo
L. S. Grant – Toledo
Wayne Johnson – New York
J. Overman – Toledo
L. L. Salosky – New York
M. Hardwick – Berlin
D. V. Anthony – Toledo



In view of everyones' concern about health hazards, we feel it necessary to add a statement to our Kaylo cartons on asbestos fiber.

All of our competitors have already taken this step.

The following statement has been approved by our Legal Department to be printed on Kaylo product cartons.

"THIS PRODUCT CONTAINS ASBESTOS FIBER.

IF DUST IS CREATED WHEN THIS PRODUCT IS HANDLED, AVOID BREATHING THE DUST.

IF ADEQUATE VENTILATION CONTROL IS NOT POSSIBLE, WEAR RESPIRATOR APPROVED BY U.S. BUREAU OF MINES."

There should be at least 1/4 inch wide dark border at the top and bottom of the statement. The size of the label or stamp should be 2 1/2" x 3", and located on the upper portion of one side panel in such a position so as not to interfere with stenciling. The first line should be in capital letters with appropriate spacing between each sentence as shown above.

Because of the importance of this statement, you are requested to take immediate action to have it printed on all sizes of Kaylo and Kaylo 20 Pipe and Block cartons as well as Kaylo Core cartons.

*No labeling on cartons of Kaylo during 1966*

A. S. Kevlin

ASK/c

*"3 pages"*

PLAINTIFF
EXHIBIT
1

| Brand Name of Product | First Year Produced Supplied Or Sold | Last Year Produced, Supplied Or Sold Or Year Asbestos Removed | Purpose For Which Product Intended | Asbestos Content (%) | Year Warning Label Placed On Product | Form Of Product (Solid, Granule, etc.) Now Past | Product Cut, Sawed, etc., at Job Site (Yes/No) | Product Mixed etc. on Job Site (Yes/No) | Physical Composition and Type of Asbestos in Product | Additional Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| CF Type II Mastic (Supplier Unknown) | July 1966 | April 1976 | Sealer for duct joints | Less than 5% by weight | Unknown | Wet pasty substance resin container | No | No | Chrysotile Asphaltic Emulsion | |
| Asbestos Paper facing used as special order facing on wrap blanket | 1930 | 1948 | Thermal insulation | Asbestos content of paper unknown | No warning label believed to have been placed on product | Solid. Presently Unknown | Unknown | No | Unknown | Asbestos paper was sold as special order facing (1 of 3) applied to each glass fiber blanket used in insulation application. Less than 157,000 of blankets sold. Asbestos paper not produced by CF. |
| Asbestos tie yarn used for special orders for metal wrap blankets | 1930 | Possibly 1962 | Asbestos tie cords, were installed at the CF Plant. Used to hold metal mesh to fiberglass blanket were cords offered as an option. | Asbestos content of yarn unknown | No warning label believed to have been placed on product | Solid. banded, telescope type, plate cartons | Unknown | No | Flexible insulating blanket, off glass wool with metal facing on one or both sides | Had to be special ordered. Asbestos tie cords not produced by CF |

non-labeling on cartons of Kaylo during 1966

**PLAINTIFF EXHIBIT I**

Date, and year label were placed on rebranded Kaylo by other Manufacturers

| Brand Name of Product | First Year Produced Supplied Or Sold | Last Year Produced, Supplied or Sold Or Year Asbestos Removed | Purpose for which Product is Used | Asbestos Content (%) | Year Warning Label Placed On Product | Form of Product (solid, smooth, etc...) How Used, | Product Cut, Sawed, etc... on Job Site (Yes/No) | Product Mixed etc... on Job Site (Yes/No) | Physical Composition and Type of Asbestos in Product | Additional Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| Kaylo Core block and pipe Kaylo 10-for temp. up to 1200F. Kaylo 20-for temp. up to 1600F, Kaylo 10-a-pipe insulation with metal jacket. | 1948 (Produced) 1949 (Sold) | Nov. 1972 (Mfg'd.) Early 1973 (Sold) | Pipe insulation High temperature industrial insulation | Approx. 15% by weight | Dec. 1966 and Nov. 1970 | Solid Cartons | Yes, as necessary | No | Asbetos and/or Chrysotile Asbestos, Calcium Silicate, organic and inorganic binders and diatomaceous earth. Asbestos 15% by weight | This product was manufactured in various sizes and lengths. Product color-Pink/Gray/ White |
| Fibersheets (Name was changed to Fyrcor in 1971) | 1970 (Produced) | 1972 | Core insulation for fireproof doors High temperature industrial insulation | Approx. 15% by weight | Mid-1971 | Semi Fiberglass weave, not a steel bands | Presumed to be cut, sawed, or routed | No | Same as Kaylo only Amosite Asbestos used. | Kaylo was a grayish color. Also a small amount was only's with a blue and white mottled appearance |
| Kaylo (Name re-branded for Smith-Wiston) | [illegible] (Produced) Land area known as Product | 1969 | Same as Kaylo | Same as Kaylo | Same as Kaylo | Same as Kaylo | Same as Kaylo | Same as Kaylo | Same as Kaylo | Same as Kaylo |
| [illegible] LS Insulation (Kaylo re-branded for Armstrong Cork) | [illegible] (Produced) | Believed to be 1962 | Same as Kaylo | Same as Kaylo | Same as Kaylo | Same as Kaylo | Same as Kaylo | Same as Kaylo | Same as Kaylo | Same as Kaylo |
| Kaylo (Re-branded for GCP by Fiberboard Co. Peten Div.) | [illegible] (sold only) | Late 60s or early 70s | Pipe insulation (High Temperature Insulation) | Unknown | Late, but same | Solid Cartons | Unknown | Unknown | Unknown | Unknown |
| Asbestos tape (Kaylo re-branded to Kaylo (Re-branded for GCP by Johns-Manville) | [illegible] (sold only) | 1969 | Pipe insulation (High Temperature Insulation) | Unknown | Unknown whether a warning label was on product at this time | Solid Cartons | Unknown | Unknown | Unknown | Unknown |
| SC-80 (SC-150) SC-40 (SC-480) Cements re-branded for GCP by Lufkin-Pinter | 1968 | 1969 | Pipe insulation | Mixed | Mixed | Granule (bulk) Bags | No | Yes | SC-80 series from 3.8 to 15 Chrysotile SC-40 series from 3 to 15 Chrysotile | |
| Ferromix Insulating Cement | Possibly 1951 | Possibly 1969 | A moldable insulation for any surface | Unknown | No warning label believed to have been placed on product | Granule Bag | No | Yes | Insulated insulation, dry mixed with refractory type materials | Believed to contain asbestos from April 1961 to October 1964 |
| Ferrolux Finishing Cement | 1948 | 1969 | Provide a finished surface to insulated pipe or tanks | Unknown | No warning label believed to have been placed on product | Granule Bag | No | Yes | Light looking fibrous material combined with asbestos fibers and settable binders | Less than 100,000 sold during period |
| OC Mastic (Purchased-Supplier unknown) | 1948 | 1960 | Protective finish over the insulation on pipe lines, boilers, ducts, breechings, connectors, expansion and other exposed to moisture or weathering | Unknown | No warning label believed to have been placed on product | Ready mixed plastic form of caulking consistency. Metal Container | No | No | Asphalt emulsion to which long asbestos fibers have been added | Less than 100,000 sold during period |

PLAINTIFF
EXHIBIT
I

Non-labeling on Cartons of Kaylo during 1966